**Baby Ray BENNETT, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 69645.**

Court of Criminal Appeals of Texas, En Banc.

Oct. 21, 1987.

J. Randall Walker, Jasper, for appellant.

Bill A. Martin, Dist. Atty., and Charles R. Mitchell, Asst. Dist. Atty., Newton, Robert Huttash, State's Atty., Austin, for State.

## OPINION

MILLER, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A., Penal Code, § 19.03. The jury answered the special issues in the affirmative and appellant was sentenced to death. Appellant brings fourteen points of error. We will affirm.

In his sixth point of error, appellant contends that the evidence was insufficient to support the jury's finding that he would pose a continuing threat to society. In order to respond to this assertion, we must examine the facts of this case.

The first witness called during the State's case in chief during the guilt/innocence portion of the trial was Inez Liversat. She testified that she lived in Nederland and knew the victim, Coyte L. Green. On Sunday, April 21, 1985, Liversat went to the victim's house to discuss some building materials. He asked her to get some information and said he would call her later. When he had not called by Wednesday of that week, Liversat called the victim's cousins, who said that they had not heard from him. She drove to the victim's house the next day. He was not at home, but Inez noticed that his television and guns were gone and that there were wet clothes in the washing machine. She ran the clothes through the washer again and dried them, expecting the victim to return at any moment.

After the victim's cousins, Mary and John Miller, called the victim's house and Liversat told them that he was not there, nor was the television or guns, they drove to the victim's house. They went into the garage and found that everything, including the victim's tool box, had been removed. The victim's dog was found dead under the back porch.

In the garage, they found the victim's car. A wheel and tire were in the trunk, along with the victim's lighter and knife. Inside the car, they found a bloody shirt. Afterward, they summoned the police.

John Miller was the second witness called. He testified that his wife was Green's cousin. Green was supposed to bring Miller some lumber, but never did so. Miller became concerned and called Green's residence. He and his wife drove to Green's house after talking to Liversat. They noticed that Green's tractor, truck and trailer were missing.

The next witness called by the State was Joe Allegood, who had known Green for over twenty years. He testified that appellant helped Green at his residence doing odd jobs.

Roy Elmore, a deputy sheriff with the Newton County Sheriff's Department, and Roscoe Davis, a Texas Ranger, were also called by the State. They had been dispatched to Green's residence. Upon arrival, they found that the house had been broken into and Green's dog had been shot. A car found in the garage appeared to have been smeared with blood. Further investigation revealed that a red tool box belonging to Green was missing, along with Green's Dodge pickup truck. The truck was found two miles from Green's house;

the battery was missing. The officers spoke to Green's relatives and were told that appellant worked for Green occasionally.

The next day, Friday, April 26, 1985, officers went to find appellant and ask him about Green's disappearance. They went to appellant's mother's house, which was about a mile and one half from Green's house. They found appellant working on an older model Ford truck and saw the red toolbox nearby. The officers also saw a new battery under the hood of the truck.

When the officers spoke to appellant, who was working on the truck, they noticed that the vehicle identification numbers appeared to have been tampered with. The officers called in the numbers to the police dispatch and were told that the numbers did not match the vehicle, which had been reported as stolen. Appellant was arrested thereafter for possession of a stolen vehicle. The truck was searched, and the guns believed to have been taken from Green's house were found. Appellant's mother gave the officers consent to search the house, and they found Green's initialed shaving bag, which contained an assortment of coins and money.

After his arrest, appellant gave a statement to the police, which contained, in pertinent part, the following:

"About two weeks ago I started planning to take a pick-up truck from a man I used to work for. I knew him as Mr. Green.

I went to Mr. Green's house before dinner on Tuesday 04–23–1985. He was gone. I walked around and looked everything over. His dog was making a lot of noise. I had my 22 rifle so I shot the dog to hush the noise. I went to the back door and used my knife to open the door. I looked around first. I found a pistol in the bedroom and a 30–30 rifle in the living room. I got them and put them by the door. I found a lot of penneys [sic] on top of the dresser. I put them in a zipper bag and put them with the guns. Then I sat and waited on Green to come in. He came in about 5:30 P.M. When he drove up he came in the back door. When he realized I was in there he turned and tried to run out. I shot him once with the pistol. I hit him in the side of the head. I think it was on the left side. He ran back to the car. I ran up to where he was. I held the gun on him and tied his arms with a piece of rope. I put him in the right front seat of the car. I shut the door and locked it. I snapped the hood and unhooked the battery so he couldn't unlock the doors. He started kicking the windows. I walked out of the garage. I went back to the house to look for the tractor keys. When I got back to the garage it was after dark.

I hooked his Dodge pickup up [sic] to the lowboy and loaded the tractor. I went back to the car and got him out of the front and locked him in the trunk. I closed the trunk lid.

I went and looked in the little tin building to see what was in it. I went and looked in the little red building by the front of the garage. I had the keys to unlock the door.

I went back to the garage and saw that he had got the trunk lid open and got out of the car. He was standing by the car. He fell. He got out of breath. Then I got him up and put him back in there. Then I put the red tool box on the trunk lid and the blue weight for the ford tractor so it would hold the lid down. He raised the lid anyway so I tied the trunk lid shut with a piece of rope. Then I loaded the tool box, cutting torch, chain saw and stuff.

It was about 1:00 A.M. by then. I wiped the blood off the side of the car and the seat. I just started driving and thinking about what to do.

I was going to throw him in the Sabine River, but there was too much traffic so I drove on like I was going to DeRidder [Louisiana]. I turned left at Junction and drove awhile looking for a place to leave Mr. Green. I turned around and came back to Merryville. At the caution light I turned left and stopped at the second bridge.

I got him out of the trunk and had him standing up. I was going to push him over the side but he fell down. When he did this I drug [sic] him down under the bridge. I saw some lights coming so I got back in the car and left.

In a little while I came back and drug [sic] him further under the bridge. Then I left and rode around awhile. I was going to go back under the bridge to see if he was dead but I saw a cop so I kept driving and came back to Texas. It was almost 6:00 A.M. when I got back to Newton. I parked the Cadillac in the garage. I walked back to my house. I changed clothes and walked back to Green's house.

I got in his Dodge truck and drove right back through Newton. I drove up highway 87 to Burkeville and turned left on highway 63 to Jasper. On the other side of Jasper I drove to Ranch Road 255. I saw H.L. Dupont at the store. I told him what I wanted to do. We went west on 255 about a mile where we turned left onto a dirt road. We drove to a trailer house where I unhooked from the trailer. We talked about an hour. I left and came back to Newton in Green's Dodge Pickup. I took the pickup to a place near my house and hid it in the woods. Then I walked home.

Dupont brought the truck to my house the evening of the same day and I took him back home. I came back home in the Ford Pickup that I traded the tractor and stuff for. About 11:00 A.M. Thursday, 04–25, I took a [sic] international brand riding lawn mower to Roger Chambers Tractor shop and sold it to him for $150.00. He wrote me a check. I came on back to Baldwins and cashed the check and bought a steering wheel for my truck."

Robert Woods, another sheriff who investigated the case, testified that after ap-

peilant was arrested and warned, and after he gave his statement, appellant drew the officers a map of where Green's body could be found. Woods phoned officers in Beauregard Parish, Louisiana, who later found the body and returned it to Texas.

Eduardo Bellas was later called by the State. Bellas was an assistant medical examiner for Harris County. He testified that he had examined Mr. Green's body on April 27, 1985. Bellas testified that Green was seventy years old when he was killed. Green had suffered three bullet wounds, two of which were shot into Green from the back. Bellas testified that Green had ultimately died from two gunshot wounds to the back of the body. Bellas testified on cross-examination that a person who had sustained the two shots from the back could be expected to live for possibly one hour. He also found an abrasion on Green's head which had been inflicted before death, approximately five hours after the bullet wounds were sustained.

After this evidence was presented, the State rested. Appellant did not produce any evidence and also rested. During the punishment phase of trial, the State showed that appellant had been convicted of theft of an automobile. After a routine traffic stop, appellant was found in possession of marihuana and a .22 caliber gun. Dr. Grigson testified that he had performed a psychiatric examination and found appellant to be in the average range of intellectual functioning. Appellant showed absolutely no remorse for committing the offense. In Dr. Grigson's opinion, appellant posed a continuing threat to society and would kill again if given the opportunity. When appellant had discussed the offense with Dr. Grigson, appellant had laughed and found it funny that the victim had been so hard to kill.[1] Shortly thereafter, the State rested.

1. In later points of error, appellant contends that Dr. Grigson's testimony should not have been admitted. When passing upon the sufficiency of the evidence, this Court has traditionally considered all of the evidence, both admissible and inadmissible. *Faulder v. State* (Tex. Cr.App. No. 69,077, delivered September 30, 1987), and cases cited therein, slip op. at 4. For the purposes of this point of error we may take into account the evidence of future dangerousness offered by Dr. Grigson for purposes of sufficiency of the evidence. As will be later stated in this opinion, however, the evidence would have been sufficient even if Dr. Grigson's testimony was excluded from consideration.

When considering whether there was sufficient evidence to support a jury's affirmative response to the second special issue regarding future dangerousness, this Court must view the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the elements of Art. 37.071(b)(2), V.A.C.C.P., beyond a reasonable doubt. *Keeton v. State,* 724 S.W.2d 58, 61 (Tex.Cr.App.1987), citing *Santana v. State,* 714 S.W.2d 1 (Tex.Cr.App.1986) and *Fierro v. State,* 706 S.W.2d 310 (Tex.Cr.App.1986).

In *Keeton,* supra at 61, we listed several factors which may be considered by the jury, which include the circumstances of the offense, the calculated nature of the defendant's acts, the forethought and deliberateness exhibited by the crime's execution, the defendant's prior criminal record, and psychiatric evidence. See also *Brasfield v. State,* 600 S.W.2d 288 (Tex.Cr.App. 1980); *Milton v. State,* 599 S.W.2d 824 (Tex.Cr.App.1980); and *Hovila v. State,* 562 S.W.2d 243 (Tex.Cr.App.1978).

■ These factors, when considered with regard to the facts of the instant case, militate strongly in favor of the jury's finding. The circumstances of the offense indicate that the murder was cold-blooded. Green was shot two times in the back when he tried to flee his home, was tied and locked in a car, and then placed in the trunk while appellant stole Green's belongings. Appellant thwarted Green's attempts to escape from the trunk. Later, Green was left under a bridge.

The record also shows that the murder was clearly calculated. Appellant broke into Green's house, killed Green's dog, and waited for Green to return. After mortally wounding Green and stealing several items from the house, appellant drove around "thinking about what to do." Appellant decided not to throw Green into the Sabine River because there "was too much traffic." He finally left Green in a somewhat hidden area and left to avoid apprehension. Appellant's acts were planned and and executed with forethought. Cf. *Warren v. State,* 562 S.W.2d 474 (Tex.Cr.App.1978).

Last, the State did present evidence that appellant had committed a felony in the past, and had possessed illegal drugs and a gun. We find that based upon the evidence presented at both the guilt/innocence and punishment stages of trial, there was sufficient evidence to support the jury's finding that appellant would constitute a continuing threat of violence to society. Appellant's sixth point of error is overruled.

In his thirteenth point of error, appellant contends that the State presented insufficient evidence to prove that appellant caused the death of Coyte L. Green as alleged in the indictment. Specifically, appellant alleges that no one was called during the State's case in chief to testify that he or she knew Green during his lifetime, had viewed the body after recovery, and that it was the body of the victim.

■ Appellant's confession showed that he had killed a man known to him as Mr. Green. Witness Allgood testified that appellant was seen at Green's house, and had "help[ed] us with different things, cut firewood and—odds and ends, just anything." The pathologist, Dr. Bellas, identified the deceased as Coyte L. Green, and testified that the body he had autopsied was the same as that retrieved from the creek, where appellant had told officers he left the body. We find that this evidence was sufficient to sustain the State's burden with regard to this issue. See *Hogan v. State,* 496 S.W.2d 594 (Tex.Cr.App.1973). Appellant's thirteenth point of error is overruled.

In his first five points of error, appellant contends that errors occurred when the trial court ordered a psychiatric examination of appellant prior to trial. In order to address these points of error, the relevant procedural facts must be set forth. The record shows that appellant's attorney filed a pre-trial motion in which he requested that the trial court grant a psychiatric examination for appellant to determine his competency to stand trial. On July 22, 1985, Dr. J.A. Hunter, M.D., of the Texas Department of Mental Health and Mental Retardation, completed his examination and

reported that appellant was sane and competent to stand trial.

Shortly before the trial began, the State filed a motion requesting the trial court to order appellant to be examined. The motion alleged, in pertinent part:

"The State has subpoenaed Dr. J.A. Hunter, who has formerly examined the Defendant at the request of the Defendant's Attorney. However, the State has been informed by the Doctor that he will not be available for testimony because he has a prior commitment in Houston, Harris County, Texas.

.   .   .   .   .

The State therefore files this Motion requesting the Court to now allow the State to have the Defendant examined by another competent psychiatrist. That Dr. James P. Grigson, 6116, North Central Expressway, Dallas, Texas, has been contacted and requested to examine the Defendant. He has agreed to examine the Defendant.

Therefore, the State requests the Court to order examination of the Defendant by Dr. James P. Grigson, a competent psychiatrist, at an immediate date, the exact time of examination to be determined by the doctor's schedule....."

A hearing was held on the State's motion, and the following arguments were made:

MR. MARTIN [Prosecutor]: Your Honor, my position in the case is that this cause, of course, is coming to trial, if nothing happens, on November 4. this year, beginning at nine o'clock, been [sic] specially set by the Court, and that the State of Texas has subpoenaed J.A. Hunter, who has formerly examined this defendant at the request of the defendant's attorney, the order having been made by this Court, I believe—if not, at least by Judge Lawlis, and I have been informed by Dr. Hunter that he has a prior commitment in Harris County in Houston, Texas, on a murder case, and for the Court's information, this is the 17th of October, and I subpoenaed Dr. Hunter better than a week ago, and he called me and told me that this was a

problem, and, therefore, we are requesting this Court to let a Dr. James P. Grigson of Dallas, Texas, examine this man.

And for the Court's information, I have had him called and he's agreed to examine him but no particular date has been set, because I wanted the Court to make his ruling on this, so I could send a motion with the—with the prisoner to Dallas.

And now with that statement, I believe [sic] that the cases—and I do not have the cases today, but simply because this motion came up for hearing a little earlier than I thought it would, but I believe that all of the cases will back the State's right to have examination of this man for the benefit of the prosecution of the man and proper warnings having taken place, we would feel like we'd be able to put the doctor on and utilize him as I would Dr. Hunter if he would be available.

So, with that brief statement or case, I ask the Court to take into consideration and grant this motion that we have for examination.

MR. WALKER [Appellant's attorney]: Your Honor, the defendant's position is that Dr. Hunter has already performed a psychiatric examination of the defendant, and that he has filed a report, and that the report states that Dr. Hunter did not find any evidence of mental disease or defect, insanity, either now or at the time of the commission of the crime.

I don't believe that there is adequate cause to, in effect, get a second opinion from Dr. Grigson. I think the fact that Dr. Hunter has a prior commitment places the State under the duty to make a motion for continuance if they have a problem with this. I don't think that the State has given the Court legally sufficient facts or reasons to request a second examination of the defendant, and for these reasons we would suggest to the Court that the State's remedy is a motion for continuance, not another motion to— or a motion to have another doctor come in and examine him simply in order to

enable the State to have a witness at the trial.

So, for these reasons, we oppose this motion, and we ask that the Court not grant it.

MR. MARTIN: In answer to that, Judge, very briefly, this is a case, as the Court well knows, that is a capital murder case, and it is specially set for the date, and the State has been in fast and furious preparation, and I understand the defense has too, Your Honor, and we do not wish to continue this case, and we're trying not to continue this case, and it is an absolute necessity we have psychiatrists involved in this matter, both for the protection of the State and the defendant, for that matter. Of course, we're not doing it for the defendant, we're doing it for the State, we'll put that in. But we believe the Court is in a position to grant this motion for us.

THE COURT: Is this doctor you're [sic] requested, will he be available to testify during this trial?

MR. MARTIN: He will, or so he's told me. You know doctors as well as I do, Your Honor.

THE COURT: Motion will be granted.

Based upon this motion, the trial court entered an order, which stated in pertinent part:

"It is therefore ORDERED that the Defendant, BABY RAY BENNETT, be examined by DR. JAMES P. GRIGSON, 6116 North Central Expressway, Dallas, Texas, phone # 214–363–3015, a qualified expert in the field of Psychiatry, to determine if the said Defendant is mentally competent to stand trial, his sanity, his mental disease or defects, if any, his dangerousness, his propensity and probability to commit criminal acts of violence that constitute a continuing threat to society....."

In his first point of error, appellant contends that the trial court erred in granting the motion because the State failed to establish any need for the hearing. In his second point of error, appellant alleges that the trial court had no authority to direct that appellant be examined by a psychiatrist for the purpose of evaluating his future dangerousness.

A court may order that a defendant submit to a psychiatric examination if the issue of the defendant's competency to stand trial is raised or if the defendant files a notice of intention to raise the insanity defense. See Arts. 46.02, Sec. 3(a) and 46.03, Sec. 3(a), V.A.C.C.P. The trial court does not, however, have the authority to appoint a psychiatrist for the purpose of examining a defendant for evidence relating solely to his future dangerousness. *McKay v. State*, 707 S.W.2d 23 (Tex.Cr. App.1985).

In the case before us, appellant was examined by a psychiatrist and found to be sane and competent to stand trial. Thus, no issues were raised which would have provided a basis for the trial court's order under Arts. 46.02 or 46.03, supra. Moreover, the State failed to establish that a new examination was necessary, alleging only that the previous psychiatrist would be unavailable for trial on the date set. Without a statutory basis for the appointment, the trial judge effectively ordered appellant to submit to a psychiatric examination solely for the purpose of determining appellant's future dangerousness. As such, the trial court erred. See *McKay, supra.*

Under the authority of the improper order issued by the trial court, the record shows that Dr. Grigson examined appellant and testified before the jury that appellant would pose a continuing threat to society. Since the order was invalid, the trial court should not have admitted Dr. Grigson's testimony.

A finding that the trial court erred, however, does not end our inquiry. When evidence has been improperly admitted at trial, reversible error will arise only if the error made has contributed to the punishment beyond a reasonable doubt. Rule 81 (b)(2), Tex. Rules App. Pro. Specifically in this case, the relevant verdict is the jury's affirmative finding with regard to the second special issue concerning whether appellant would pose a continuing threat to soci-

ety. See & cf. *Sanne v. State*, 609 S.W.2d 762 (Tex.Cr.App.1980); and *Cunningham v. State*, 500 S.W.2d 820 (Tex.Cr.App.1973). See also *Powell v. State*, 742 S.W.2d 353 (Tex.Cr.App. No. 67,630, delivered July 8, 1987); *Anderson v. State*, 717 S.W.2d 622 (Tex.Cr.App.1986) and *Goodman v. State*, 701 S.W.2d 850 (Tex.Cr.App.1985). We must look to the facts of each case to make this determination. *Sanne*, supra at 774, citing *Ex parte Flores*, 537 S.W.2d 458 (Tex.Cr.App.1976).

█ Although Dr. Grigson did give his opinion that appellant would be violent in the future, the jury also had before it the details of cold-blooded, calculated, drawn out, and brutal murder. The evidence at the guilt stage of trial showed that the victim was a seventy year-old man. Appellant had planned to steal a truck from Green at least two weeks before the murder occurred. On the date of the offense, appellant broke into Green's house, murdered Green's dog, and laid in wait for Green to return. After Green arrived, appellant immediately and without provocation shot him with a pistol, wounding Green in the side of the head. The evidence also showed that Green had been shot two other times in the back. Appellant thwarted several escape attempts made by Green, and at one time, put Green in the trunk of a car and loaded a tool box on top. After stealing Green's property, and holding Green hostage for nearly eight hours, appellant decided to throw Green into a river. Appellant, having consciously decided the route to take so as to avoid traffic, then drove to Louisiana. Green may have been alive at this time, but died when appellant stopped in Louisiana where he put Green's body under a bridge.

During the punishment stage of trial, the State introduced evidence independent of Dr. Grigson's testimony, that appellant had been convicted of theft, and had been found in possession of illegal drugs and a gun.

On the basis of the preceding summary of the evidence, especially the facts of the offense itself, we find that the jury's finding that appellant would be a continuing threat to society was amply supported. We further find that the jury's finding would not have been different had Dr. Grigson's testimony been excluded. Thus, beyond a reasonable doubt, the error did not contribute to the punishment. Rule 81 (b)(2), Tex. Rules App.Pro. See & cf. *Sanna*, supra and *Bush v. State*, 697 S.W.2d 397, 399–400 (Tex.Cr.App.1985), citing *Roney v. State*, 632 S.W.2d 598 (Tex.Cr. App.1982). See also, generally, *Cannon v. State*, 691 S.W.2d 664 (Tex.Cr.App.1985), and cases cited therein at 678, and *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977). Appellant's first and second points of error are overruled. Since appellant's third, fourth, and fifth points of error concerned other errors with regard to admission of Dr. Grigson's testimony, we will also overrule them under the harmless error doctrine.

In his tenth and eleventh points of error, appellant contends that the trial court erred in denying his motion to suppress the confession and his motion to suppress evidence at trial since appellant's arrest was illegal. Specifically, appellant argues that the officers did not have probable cause to arrest him and that the arrest was used as a pretext for investigating Green's disappearance.

The record shows that the officers investigating Green's disappearance had gone to his residence and found that several items were missing, including a red tool box, coins, and some guns, and that his dog had been killed. A substance believed to be blood was found on Green's car. The officers later found Green's truck hidden in the woods with the Mopar battery missing. The Allgoods had informed one officer that there had been some animosity between appellant and Green. During the search of the area of Green's residence, one officer looked through a small storage building and noted that it was locked with a padlock bearing the numbers 2404.

The officers went to appellant's mother's house to investigate the offense. There, they found appellant working on a truck. One officer observed a new Mopar battery in the truck, a red toolbox in the truck bed,

and a key bearing the numbers 2404 inside the truck. Appellant consented to the officers' request to look at the truck's vehicle identification numbers. The numbers had been tampered with and a check with the police dispatcher revealed that the truck had been stolen. Appellant was arrested about ten minutes later for possession of a stolen vehicle. A search of the stolen truck disclosed guns believed to have been taken from Green's residence.

After appellant's arrest, the officers asked his mother for permission to search the house, which she gave in writing. Inside the house, officers discovered a shaving kit with Green's initials which contained money and coins.

The officers testified that appellant was arrested for possession of a stolen vehicle. Thus, in order to respond to appellant's contention that the officers did not have probable cause to arrest appellant, we will consider the facts available to the officers concerning whether he was in possession of a stolen vehicle.

In order to determine that an officer had probable cause to arrest a suspect, there must be sufficient facts to warrant a man of reasonable caution in believing that an offense has been committed. *Black v. State*, 739 S.W.2d 240, 243 (Tex.Cr.App. 1987). Mere suspicion is not sufficient. *Gill v. State*, 115 S.W.2d 923 (Tex.Cr.App. 1938).

In the case at bar, the officers checked the vehicle identification number on the truck and testified that it appeared to have been tampered with. The officers then called other officers and were informed that the vehicle had been stolen. We must look at the cumulative information available to the officers at the time. See *Hoag v. State*, 728 S.W.2d 375 (Tex.Cr. App.1987). We find that the officers had sufficient knowledge to support the claim that appellant was in possession of a stolen vehicle, and therefore had probable cause to support the arrest for possession of a stolen vehicle.

Appellant also claims in his brief that the arrest for possession of a stolen vehicle was used as a pretext to search for evidence related to Green's disappearance. Although appellant contested admission of the evidence on the grounds that the arrest was not supported by probable cause, appellant did not object to admission of the evidence because a pretext search had occurred. Thus, appellant's contention is not preserved for review. See *Hodge v. State*, 631 S.W.2d 754 (Tex.Cr.App.1982); *Vanderbilt v. State*, 629 S.W.2d 709 (Tex.Cr. App.1981); *Carillo v. State*, 591 S.W.2d 876 (Tex.Cr.App.1979); and *Crocker v. State*, 573 S.W.2d 190 (Tex.Cr.App.1978). Appellant's tenth and eleventh points of error are overruled.

In his seventh point of error, appellant contends that the trial court erred by improperly sustaining the State's challenge for cause to prospective juror Lester Warren. He argues that the prospective juror did not indicate that he could not follow the law and impose the death penalty.

The record shows the following testimony was presented during the State's examination of prospective juror Warren:

Q. [By the prosecutor] Could you resolve yourself with your conscience to vote for the death penalty?

A. I don't believe I could.

Q. All right, in any case?

A. No, sir.

· · · · ·

Q. And let me ask it a little different way and let me see if you—Is it true, or not, that you would automatically vote against the death penalty in any case regardless of the facts?

A. I believe I would.

The State challenged the prospective juror for cause and appellant's attorney was permitted to examine Warren:

Q. [By appellant's counsel] Okay, Mr. Warren, what if you were selected on this jury or on any jury and what if you were not asked to go back and vote as to whether someone would be put to death or not, what if all you had to do, and all the Court instructed you to do, was to go back and answer two questions to the best of your ability; the first question being, was the murder committed delib-

erately, and the second question being, is there any reason to believe that the defendant would be a danger in the future. In spite of your beliefs about the death penalty, could you go back in the jury room with the other members of the jury and give a true answer based on the evidence to those two questions?

A. Yes, sir, I believe I could.

Q. And that would be in spite of any views you may have about the death penalty or whether or not it should be imposed?

A. Yes.

Q. And you would let the chips fall where they may and let the law take its course based on those questions?

A. That's right.

Q. You wouldn't let that interfere, you wouldn't go back and try to figure out whether the answers you were giving would help or hurt the defendant on the death penalty if you—is that correct?

A. No, I wouldn't.

Q. Is that correct?

A. No, I wouldn't.

Q. You would just go back and answer the questions to the best of your ability?

A. Yes.

The State then re-examined Warren. After the prosecutor explained that the judge did not assess punishment, that the jury decided whether the defendant was to receive the death penalty, and in so doing, had to answer two questions in a certain way, the following exchange occurred:

Q. [By the prosecutor] Now, my question is, could you, with your honest believe [sic] about the death penalty—and I don't have any quarrel with your belief about the death penalty, it's—

A. Yes, sir, I understand that.

Q. Could you answer those questions in such a way that the man would be sentenced to death?

A. No, sir, I can't, I couldn't do that.

The State's challenge for cause was then sustained.

In *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that in order for a juror to be subject to a challenge for cause based upon that juror's views on the death penalty, the record must show that the juror's views would prevent or substantially impair the performance of his or her duties in accordance with the oath taken and the trial judge's instructions. The Supreme Court also indicated that reviewing courts were to give due deference to the trial court's decision given its position to gauge the juror's sincerity and demeanor.

In the instant case, prospective juror Warren stated initially that he did not believe in the death penalty and would automatically vote against it regardless of the facts of the case. On examination by appellant's attorney, Warren indicated that if he were not asked to vote for the death penalty, he would be able to answer the two questions based on the evidence. Once the prosecutor explained that the jury's response to the questions would determine whether the defendant received the death penalty, Warren stated that he could not respond in a way so that the defendant was sentenced to death.

The record of this case is similar to that present in *Sawyers v. State,* 724 S.W.2d 24 (Tex.Cr.App.1986), where the prospective juror was confused over the punishment procedures: if the juror did not know that an affirmative response to both questions would result in a sentence of death, then he could answer them according to the evidence. Once, however, the procedure was explained, the juror indicated that he would vote against the death penalty no matter what the evidence showed. We held that the trial court did not err by granting the State's challenge for cause.

We find that on the facts of this case, according due deference to the judgment of the trial court, the prospective juror indicated that his views on the death penalty would impair his ability to follow his oath and the trial court's instructions. Thus, the trial court did not err by sustaining the prosecutor's challenge for cause. Appellant's seventh point of error is overruled.

In his eighth point of error, appellant contends that the trial court erred by improperly sustaining the State's challenge

for cause to prospective juror Patsy Sykes. On initial examination by the State, Sykes stated that she did not believe in the death penalty and under no circumstances could vote for it. The prosecutor explained the special issue procedure, and Sykes indicated that she could not answer the questions in such a way that the death penalty would be assessed.

On examination by appellant's attorney, Sykes stated that she would be honest about her responses to the questions. When re-examined by the prosecutor, Sykes stated: "... I don't believe in capital murder, I don't believe in it, and I don't believe in it." When the prosecutor asked her whether she would automatically vote against the death penalty, she said:

"Be honest, I really couldn't say, I don't know, I don't think so. I can't say that because I don't believe in capital murder."

She later stated that she did not know whether her views would require her to automatically vote against the death penalty.

On re-examination by appellant's attorney, she stated that she could consider assessing the death penalty in a case involving a defendant like Adolph Hitler. When the prosecutor asked her whether she could impose the death penalty and live with her conscience, she responded that she could not. The trial court then sustained the State's challenge for cause.

The testimony presented by this juror is similar to that presented in *Clark v. State*, 717 S.W.2d 910 (Tex.Cr.App.1986). In that case, the prospective juror vascillated in her responses regarding the special issues. She first indicated that she had conscientious scruples against the infliction of the death penalty but later stated that she could answer the special issues in the affirmative if supported by the evidence, and there were some instances where she felt the death penalty was an appropriate punishment. This Court examined the entire voir dire and concluded that the trial court had not abused its discretion in sustaining the State's challenge for cause.

In the instant case, the juror clearly indicated that she did not believe in the death penalty. Although she stated that she would answer the questions honestly, and that there were some circumstances in which she could vote for the death penalty, the overall character of her examination reveals a deep seated opposition to the death penalty which would have affected her ability to follow her oath and the instruction given by the trial court. We therefore find that the trial court did not err by sustaining the State's challenge for cause. Appellant's eighth point of error is overruled.

In his ninth point of error, appellant contends that the trial court erred in refusing to grant appellant a new trial because of jury misconduct. At the conclusion of the trial, appellant filed a motion for new trial alleging jury misconduct in the punishment phase of the trial. The motion was supported by an affidavit from a jury member named Mrs. Pierce Krouse, who stated that she was not convinced beyond a reasonable doubt that appellant would be a continuing threat to society but answered the question "yes" because other members of the jury told her that the judge could not accept an undecided answer on that issue and that they had to stay in the jury room until they could agree on a decision. She stated that she could never convince the other members to vote "no" so she believed that she must vote "yes" since a deadlock would not be accepted by the court.

Appellant argues that he was entitled to a new trial based upon two statutes. Under Art. 40.03(3), V.A.C.C.P., a defendant has a right to a new trial if the jurors decided the verdict in a manner other than by a fair expression of their opinions. Also, under Art. 40.03(7), V.A.C.C.P., a defendant has a right to a new trial if the jury receives "other evidence," in this case, the allegation that the court could not accept a hung jury.

The record also contains controverting affidavits filed on behalf of the State by other members of the jury. Juror Russell Gorski, the foreman of the jury, stated that he remembered asking Krouse whether she

thought appellant would "go out and do this thing again." Krouse stated, "Yes, I do." The jurors were getting upset, so Gorski called for a recess. Krouse went off by herself and reread the second special issue. She asked Gorski to reconvene the jury and stated, "I do believe beyond a reasonable doubt that he will be a continuing threat to society."

Another affidavit was filed by juror James Hancock, who stated that he did not recall anyone stating what the ruling of the Court was or what the Court would rule on any particular issue. He added that Krouse agreed to vote "yes" to the second special issue because she felt the State had proved it beyond a reasonable doubt. These observations were also noted in juror Carolyn Dennard's affidavit.

With regard to appellant's claim that the jurors did not decide the verdict by a fair expression of opinions, we note that simply because a juror changes his or her vote to avoid a hung jury does not entitle the defendant to a new trial. See *Powell v. State*, 79 Tex.Cr.R. 526, 187 S.W. 334 (1916). See also *Stockton v. State*, 109 Tex.Cr.R. 554, 5 S.W.2d 996 (1928) (opinion on motion for rehearing). Thus, even if we considered only Krouse's affidavit, appellant would not necessarily be entitled to a new trial under Art. 40.03(3), supra.

Moreover, it is well established that issues of fact regarding jury misconduct are for the trial court to determine; where there is conflicting evidence on those issues, there is no abuse of discretion when the motion is overruled. *Sneed v. State*, 670 S.W.2d 262 (Tex.Cr.App.1984), and cases cited therein at 266. Since there were conflicting affidavits on this issue, the trial court did not abuse its discretion by overruling appellant's motion for new trial based upon Art. 40.03(3), V.A.C.C.P.

With regard to the claim that the jury received other evidence which constitutes grounds for a new trial under Art. 40.03(7), supra, appellant must show two requirements in order to be entitled to a new trial: first, that the "other evidence" was received by the jury, and second, that the evidence was detrimental to the defend-

ant. *Hunt v. State*, 603 S.W.2d 865, 868 (Tex.Cr.App.1980), citing *Trevino v. State*, 582 S.W.2d 111 (Tex.Cr.App.1979). The instant record does not establish that the jury received any other evidence than that provided during the trial. Krouse's affidavit does not contain a statement that the jury received outside evidence. Since the first part of the test was not satisfied, appellant has not shown he was entitled to a new trial under Art. 40.03(7), supra.

Since appellant did not establish that he was entitled to a new trial and since the affidavits submitted at the hearing on appellant's motion contained conflicting facts, the trial court did not err by overruling appellant's motion. Appellant's ninth point of error is overruled.

In his twelfth point of error, appellant contends that the trial court erred in admitting into evidence the written statement that appellant gave the Louisiana police officers. Appellant argues that the warnings set out on the face of the written statement fail to comply with Art. 38.22, V.A.C.C.P., since appellant was not warned that any statement he gave could be used against him *at his trial*, nor was he warned that the statement could be used as *evidence* against him. [Emphasis in appellant's brief.]

The warnings listed in the statement appellant gave to the Louisiana police stated the following, in pertinent part:

(2) anything you say can be used against you in court.

The crux of appellant's argument is that since the warning did not state specifically that "any statement he makes may be used as evidence against him in court," it was insufficient as a matter of State law.

In *Penry v. State*, 691 S.W.2d 636, 643 (Tex.Cr.App.1985), we held that:

"A warning which conveys on the face of the statement, in only slightly different language, the exact meaning of the statute is sufficient to comply with the statute."

We see no substantive difference between use of the term "can" instead of "may," except to the extent that use of the former

is improper grammatically. Also, we find that the meaning of the warning is not made less precise by omission of the term "evidence," especially to someone not well versed in trial procedures. Last, that the term "court" was used instead of "trial" again does not dilute the meaning or the import of the warning. In sum, we find that the warning given appellant with regard to the manner in which his statement could be used against him was sufficient to comply with Art. 38.22, supra. See also *Eddlemon v. State*, 591 S.W.2d 847 (Tex. Cr.App.1979) and *Darden v. State*, 629 S.W.2d 46 (Tex.Cr.App.1982). Point of Error Number Twelve is overruled.

In his fourteenth point of error, appellant contends that the prosecutor made improper jury argument during his closing remarks at the punishment phase of trial. The complained of remarks are as follow:

> "There wasn't anything ... there wasn't anything holding [appellant] there. Except for a blood thirsty attitude, and a cold blooded attitude, wanting to kill this man, for whatever reason. I won't—except to make sure he got away with everything, and possibly to try to submit to you that *he was torturing the man to try to find out where more money was, so he could take more money off him* —." [Emphasis in appellant's brief.]

Appellant's attorney objected to use of the term "torturing," but was overruled by the trial judge.

Proper jury argument must fall into one of four areas:

1. summation of the evidence;
2. reasonable deductions from the evidence;
3. answer to argument of opposing counsel; or
4. pleas for law enforcement.

*Phillips v. State*, 701 S.W.2d 875 (Tex.Cr. App.1985); *Franklin v. State*, 693 S.W.2d 420 (Tex.Cr.App.1985) and *Brandley v. State*, 691 S.W.2d 699 (Tex.Cr.App.1985). ▮ The facts of this case show that appellant waited in Green's house until Green arrived, shot Green in the back after he came into the house, tied the wounded Green and locked him in a car, and after Green escaped from the car, appellant put him in the trunk and weighted down the lid. Appellant then drove to Louisiana, parked beside a creek, and threw Green's body into the water. The record shows that approximately seven hours elapsed from the time appellant first shot Green until the time he left for Louisiana. We find that on these facts, the prosecutor's use of the term "torture" was a reasonable deduction from the evidence and therefore not improper. Appellant's fourteenth point of error is overruled.

Finding no reversible error, we affirm the conviction.

TEAGUE, J., dissents, and especially dissents to the total disposition of points of error numbered 1–5, inclusive, and to most of the reasoning that is used to overrule the other points of error.

CLINTON, and DUNCAN, JJ., dissent to holding that admitting testimony of Dr. Grigson is harmless error.