**Baby Ray BENNETT, Appellant,**

**v.**

**James A. COLLINS, Director Texas Department of Criminal Justice, Institutional Division, Respondent.**

No. 6:89 CV 703.

United States District Court,
E.D. Texas,
Tyler Division.

Oct. 28, 1993.

Eden E. Harrington, Austin, for appellant.

William Charles Zapalac, Austin, for respondent.

1. A brief summary of the facts may be helpful: applicant was in the process of stealing the decedent's truck when the decedent returned to his home; applicant shot the decedent, tied him up, drove to another state, and left the decedent, allegedly alive at the time, under a bridge. The facts of the case are set forth in full detail in *Bennett v. State*, 742 S.W.2d 664 (Tex.Cr.App. 1987).

**ORDER**

JUSTICE, District Judge.

## I. Background and Procedural History

Applicant, Baby Ray Bennett, is a thirty year old black man. He is currently on death row at the Ellis 1 Unit of TDC, in Huntsville, Texas. (Application for Writ of Habeas Corpus at 1) [hereinafter ·Application]. Bennett was tried and convicted of capital murder,[1] and sentenced to death, in Case No. 3589, in the District Court of Newton County, 1st Judicial District of Texas, in November of 1985. He moved for a new trial on the basis of an affidavit filed by one juror indicating that she had answered Special Issue No. 2 "yes" even though she had reasonable doubt on the issue. (Application at 4). The motion for a new trial was denied. (*Id.* at 1). Applicant's conviction and death sentence were affirmed on direct appeal by the Texas Court of Criminal Appeals. *Bennett v. State*, 742 S.W.2d 664 (Tex.Crim.App.1987).

Thereafter, applicant petitioned the United States Supreme Court for the writ of certiorari. Upon granting the writ, the Supreme Court vacated the death sentence, and remanded the case for further consideration in light of *Satterwhite v. Texas*.[2] *Bennett v. Texas*, 486 U.S. 1051, 108 S.Ct. 2815, 100 L.Ed.2d 917 (1988). The Texas Court of Criminal Appeals reexamined the case, but declined to engage in harmless error analysis because it was found that there had been no violation of applicant's Fifth or Sixth Amendment rights in connection with psychiatric testimony offered by Dr. Grigson's. Thus, the Texas Court of Criminal Appeals reaffirmed the original judgement, upholding the conviction as well as the death sentence. *Bennett v. State*, 766 S.W.2d 227, 231 (Tex. Crim.App.1989). Three judges dissented on the grounds that there had been constitution-

2. 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1987) (finding that psychiatric testimony, admitted in evidence although the· examination had been in violation of defendant's Sixth Amendment right, is not harmless error unless the State proves beyond a reasonable doubt that the error complained of did not affect the ultimate verdict).

al violations, and that Dr. Grigson's testimony was, in fact, harmful error. *Id.*, at 232. Applicant again petitioned the United States Supreme Court, but certiorari was denied. *Bennett v. Texas,* 492 U.S. 911, 109 S.Ct. 3229, 106 L.Ed.2d 578 (1989).

On August 8, 1989, applicant filed an application for the writ of habeas corpus with the District Court of Newton County.[3] The trial court denied the application and accompanying motions, without a hearing, on November 17, 1989, ten days after the state's answer was filed, but before applicant had filed a response to the state's answer. (Application at 3). On November 29, 1989, the Texas Court of Criminal Appeals affirmed the trial court's dismissal as to all but one issue,[4] which was set for submission to the court without argument. On October 16, 1991, the Texas Court of Criminal Appeals entered a written, unpublished order denying relief on the submitted issue. *Ex parte Bennett,* Application No. 70, 982 (Tex.Crim.App.1991). The state court's mandate was stayed on January 2, 1992, to allow applicant to seek relief in federal court. (Application at 3).

While the application was pending before the Texas Court of Criminal Appeals, applicant filed an application for the writ of habeas corpus with this court, on November 29, 1989. On December 20, 1989, this court entered an order staying the proceedings pending exhaustion of all state court remedies. After the Texas Court of Criminal Appeals denied Bennett's application, applicant moved to lift the stay entered by this court. On December 2, 1991, this court lifted the stay and granted applicant's motion to amend his original habeas application.

Applicant filed his amended application for the writ of habeas corpus on January 14, 1992. On June 5, 1992, this court entered an order that respondent show cause and answer within forty days from the date of service of the order; the answer was due July 15, 1992. Five days after the answer was due, on July 20, 1992, respondent filed a motion to extend time, which this court granted on July 21, 1992. A new due date was set for the answer, August 3, 1992. Respondent again failed to file a response, and again moved for an extension of time, on August 4, 1992, after the deadline had passed. On August 7, 1992, this court granted respondent's second motion for an extension, and set the due date for August 10, 1992.

Applicant, having not received a copy of respondent's answer by August 31, 1992, filed a motion for a special hearing on the merits, as well as requesting a finding that, as a result of its failure to respond in a timely manner, respondent had waived the procedural default defense.[5]

By October 30, 1992, this court had still not received respondent's answer, and therefore entered an order requiring that the attorneys for respondent appear before the court and show cause why they should not be held in contempt for violating the court's prior order to respond to applicant's writ of habeas corpus.

Respondent's attorney appeared before the court for the hearing on November 5, 1992.

---

3. At this time, applicant's execution date, originally set for May 19, 1989, postponed until August 19, 1989 (while the case was pending before the U.S. Supreme Court), was reset for December 1, 1989. .

4. The issue concerned applicant's claim that the Texas capital sentencing statute is unconstitutional because it does not provide the jury with adequate guidance concerning its ability to consider and act upon mitigating evidence.

5. The issues that respondent proposes to have barred for procedural reasons are not trivial ones. Among the issues in controversy is a *Batson* issue. Applicant, who is black, asserts a *Batson* claim based on the fact that although twelve of the sixty-five venirepersons were black, there were no blacks on the jury eventually impaneled in the case. Applicant asserts that of the twelve blacks who were questioned during voir dire, one was excused because she could not read or write; another was excused for cause because she was in the courtroom for part of another venireperson's voir dire; five blacks were excused for cause on the prosecutor's motion; and the prosecution used peremptory challenges to strike the remaining five venirepersons. Another of the controverted issues is whether Dr. Grigson's psychiatric evaluation of applicant violated applicant's Fifth or Sixth Amendment rights, or both, and if a constitutional violation occurred, whether the error was harmless, or reversible.

At that time, the attorney explained that, as far as he knew, the answer, containing a motion for summary judgement, was delivered to the mailroom on August 7, 1992, and he assumed that the document would be received by the court by the August 10, 1992 deadline.[6]  At the November 5, 1992, hearing, respondent explained that he had asked for the extensions because of "the length of the pleading and everything else, on August 4th Judge Hughes in Houston ordered our office to respond to a habeas petition in a death penalty case where there was an imminent execution date, and he wanted a response by the 7th of August." (Transcript of show cause hearing at 4).  It has been noted with disapproval that counsel for the respondent offered a different explanation as to why he needed additional time to file his response in his second motion for extension of time and brief in support, filed with this court on August 4, 1993.  In that motion, counsel explained that he needed additional time because he was

> forced to suspend work on it [the response in *Bennett*] when [he was] assigned the task of preparing a portion of Respondent's Supreme Court brief in *Graham v. Collins*, ... in which briefs were due on August 22, 1993.... Due to the pressing nature of this task, there has not been sufficient time to complete the answer in this cause.

Respondent's Second Motion for Extension of Time at 1–2.[7]  Giving respondent the benefit of any doubt, this court allowed respondent to file a copy of its answer and motion for summary judgement.

6.  It has been noted that there is some discrepancy in the attorney's description of the delivery of documents to the mailroom:  initially, counsel explained that the answer was delivered to the mailroom; subsequently, he stated that the people from the mailroom picked the envelopes up from his office, and that he assumed they were mailed.  Transcript of November 5, 1992, show cause hearing at 2–3.

7.  Respondent's various explanations as to why an extension was needed demonstrate an apparent lack of recognition that the present action, like the actions referred to in the motion for extension and at the show cause hearing, is also an important death penalty case.  The proffered explanations also reveal an unconscionable indif-

On April 1, 1993, this court entered an order that a hearing be set to determine the merits of applicant's writ.  A pretrial conference was held on May 18, 1993.  Among the issues discussed at the pretrial conference was applicant's pending motion to find that the respondent had waived the procedural default defense.  Applicant asserted that the court should find that the state had waived the procedural default defense by failing to respond in a timely manner.  The respondent argued that

> the court has already accepted the explanation of the State that the response was prepared and, at least, an attempt was made to file in a timely fashion, and that because of this the arguments for asserting a waiver of the procedural defenses being made by the petitioner is not valid.

(Transcript of the pre-trial conference at 8–9).

Applicant suggested that simply because the court permitted respondent to file an answer, the court had not thereby disposed of applicant's motion.  Applicant argued that, in order to serve the ends of justice, the court should take the opportunity to disregard the procedural defaults.  The court took applicant's motion under advisement, and set applicant's hearing on the merits for December 6, 1993.

The court has never received a formal response from respondent to applicant's motion asking the court to find that respondent has waived the procedural default defense.[8]  It is unclear why respondent has neglected to respond to applicant's motion; perhaps

ference to respondent's duty to provide the court with accurate, and consistent, information in all of its communications with the court.

8.  At the November 5, 1992, show cause hearing, respondent informed the court that it had not received a copy of applicant's August 31, 1992 motion.  Counsel for the applicant was not present at the November show cause hearing, because he had been excused by the court.  Thus, he did not learn that respondent had never received the August 31, 1992, motion until the pretrial hearing.  Thus, even assuming that respondent did not receive a copy of applicant's motion for a waiver until the pre-trial hearing in May of 1993, respondent has still had almost five months to respond to this pending motion.

respondent misunderstood the argument made at the May 18, 1993, pre-trial conference to be a response to the motion. Never having received a formal response to applicant's motion, the motion has been decided without⌐ the benefit of respondent's input, aside from the argument made at the pre-trial conference.

On August 23, 1993, applicant filed an unopposed motion to amend his habeas application. This court granted the motion and entered an order to that effect on August 25, 1993. In the August 25th order, the court stated that the respondent shall have thirty days to respond to the amended application. Once again, the court did not receive an answer, or a motion to extend time, before the thirty day period had expired. On September 27, 1993, respondent filed an untimely motion for an extension of time, proposing to file the amended answer on October 1, 1993.

Having determined that respondent has delayed far too often in these proceedings, and in an untimely manner in each instance, the motion for an extension of time shall be denied. Although the respondent did not receive a favorable ruling on its motion for an extension of time, the amended answer was filed, in an untimely manner, on October 1, 1993; however, the untimely amended answer will be disregarded.

■ This most recent delay is incomprehensible to the court, given the clear message delivered to respondent at the November 5, 1992, show cause hearing. The continued delay has forced the court to confront the reality of the present situation: despite repeated second chances by this court, including several extensions of time granted although the requests were filed in an untimely manner, respondent continues to flout the procedural requirements of the court. Such flagrant abuse of the system, resulting in numerous periods of delay, cannot be tolerated. Thus, it has been determined that due to respondent's extraordinary and repeated pattern of delay, rising to the level of *mora*, applicant's motion will be granted. As a result, respondent's procedural default defenses raised in the response filed at the November 5, 1992, show cause hearing will be deemed to have been waived. Respondent's egregious behavior throughout these proceedings warrants this admittedly severe sanction.

## II. Legal Standard and Analysis

### A. Time Limits of Habeas Corpus Act and Fed.R.Civ.P. 81(a)(2)

■ The law governing the writ of habeas corpus demonstrates that prompt resolution of the writ is of substantial importance. The pertinent language of the federal Habeas Corpus Act provides:

> A court, justice or judge entertaining an application for a writ of habeas corpus shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto.

> The writ, or order to show cause shall be directed to the person having custody of the person detained. It shall be returned within three days "unless for a good cause additional time, not exceeding twenty days, is allowed...." (28 U.S.C. § 2243).

When the application is filed pursuant to 28 U.S.C. § 2254, as in this case, the time limits set forth in the Habeas Corpus Act are extended, permitting the court to grant respondent up to forty days to respond to the application. Federal Rule of Civil Procedure 81(a)(2) states:

> The writ of habeas corpus, or order to show cause, shall be directed to the person having custody of the person detained. It shall be returned within 3 days unless for good cause shown additional time is allowed which in cases brought under 28 U.S.C. § 2245 shall not exceed 40 days, and in all other cases shall not exceed 20 days.

The language of the Habeas Corpus Act and Rule 81(a)(2) confirms that the respondent is required to respond promptly. The emphasis on a timely response makes sense in so far as the purpose of the writ is to allow a person in custody to challenge a wrongful,

perhaps unconstitutional, imprisonment.[9] Considering the importance placed upon a timely response by respondent, it should not be surprising that courts have reacted with a wide variety of sanctions when respondents fail to meet the court imposed deadlines.

## B. Judicial Responses to an Untimely Response

Many courts have rejected the use of default judgement in a habeas proceeding,[10] and have required a hearing on the merits; [11] however, these courts nonetheless have acknowledged that when the respondent has repeatedly disrupted proceedings, alternative sanctions to the default judgement are necessary. *See, Stines v. Martin,* 849 F.2d 1323, 1325 (10th Cir.1988) ("When the government failed to respond to the petition for habeas corpus relief, the district court was entitled to invoke a sanction appropriate to the circumstances."); *Ruiz v. Cady,* 660 F.2d 337, 341 (7th Cir.1981) ("[T]here are several alternatives [to default judgement] the court might have employed as a more appropriate sanction. It could have notified the attorney general that in the future, requests for exten-

sion would be routinely denied. . . . It could have disciplined counsel or instituted contempt proceedings. . . .").

■ Among the many options available to a district court when the respondent fails to file a timely response is to refuse to consider any untimely response. Several circuits, including the Fifth Circuit, have acknowledged that when the respondent fails to file a response within the time frame set by the court, the district court may decide not to entertain any response which may be finally filed.

For example, the Seventh Circuit has specifically stated that in a case such as the one before the court, "[i]t would also have been appropriate for the district court to censure the staff of the Illinois Attorney General and to refuse to consider the tardy return." *Mattox v. Scott,* 507 F.2d 919, 924 (7th Cir. 1974) (citing *Curtis v. Perini,* 413 F.2d 546 (6th Cir.1969)).

■ The Fifth Circuit has similarly recognized that in certain instances, the district

---

9. In a discussion of the legislative history of, and intent behind, the rules governing the time limits of the writ, the Seventh Circuit has explained:
   > This legislative schedule evinces the viewpoint of Congress that dispatch is of utmost importance in habeas proceedings. Congress was undoubtedly influenced by the possibility that the habeas corpus petitioner might be unlawfully imprisoned, and the time limits demonstrate its concern for an expeditious determination of the issue.

   *Mattox v. Scott,* 507 F.2d 919, 923 (7th Cir.1975).

10. A default judgement enables a court to protect a party, as well as the court itself, from unacceptable delay tactics on the party of the opposing party. In describing the purpose of default judgement, Professors Wright and Miller explain by quoting the following opinion:
    > "[A] default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party. In that instance, the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights." The court went on to say that the possibility of being held in default acts as a deterrent to those parties resorting to delay as an element of their litigation strategy.

    10 Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2681 (1983) (quoting *H.F. Livermore Corp. v. Aktienge-*

*sellschaft Gebruder Loepfe,* 432 F.2d 689, 691 (D.C.Cir.1970)).

Some courts have considered default judgement to be an appropriate sanction when a respondent fails to answer the writ. *See, e.g., Ruiz v. Cady,* 660 F.2d 337 (7th Cir.1981) (holding that although default judgement should be rare in a habeas corpus proceeding, it should be preserved as a sanction against a respondent's unwarranted delay). In *Ruiz v. Cady,* the court reasoned that if "the respondent is guilty of long and inadequately explained delays, it may be presumed that applicant is being illegally confined." *Id.,* at 340. The court made this argument with a full understanding of the consequences of entering default judgement, recognizing that "such a remedy is extreme, and may well conflict with the public's right to protection." *Id.*

11. In several circuits, district court judges, apparently frustrated by the lackadaisical attitude of the states' attorneys, have granted the writ by entering default judgement against the state; the appellate courts, however, have reversed the district courts and remanded the matter, ordering the district court judges to have a hearing to consider the merits of the writ. *See, e.g., Bermudez v. Reid,* 570 F.Supp. 290 (S.D.N.Y.1983) (granting default judgement for applicant), *rev'd,* 733 F.2d 18 (2d Cir.1984) (reversing district court and ordering a hearing on the merits).

court may refuse to entertain a belated response. In *Frick v. Quinlan,* 631 F.2d 37 (5th Cir.1980), the court considered a case in which the government was dilatory in filing a response to the habeas application. The magistrate had ordered the respondent to show cause within thirty days, but the government did not respond until thirty-five days had elapsed, five days late. The court found that "Frick does not specify any prejudice resulting from this delay, and, in fact, there was none. The district court was free to either consider or disregard the response." *Id.,* at 40. Thus, even if the delay is as short as five days, and even if applicant is not prejudiced by the delay, the court may exercise its discretion and decide not to consider the response.

In the instant case, the respondent was ordered to file a response by July 15, 1993; two untimely requests for extension were made, and granted, with the final deadline set as August 10, 1993, twenty-six days after the response was originally due. Neither the court, nor the applicant, received a copy of the response until the November 5, 1993 show cause hearing, almost four months after the response was originally due, and almost three months past the latest date approved by the court. This thirty to forty day delay is far greater than the five day delay in *Frick,* in which the Fifth Circuit clearly stated that the district court was free to disregard the untimely answer, regardless of whether any prejudice had been suffered by the applicant.

■ Although the court permitted respondent to file its response at the November 5, 1992, show cause hearing, the court retains the power to disregard the response, or portions of the response such as the procedural defense. Respondent has argued that the court mooted the question of waiver of the procedural default defense by allowing respondent to file late, but respondent has not submitted any written arguments on this issue, nor did respondent cite any case law on this point during their oral presentation. Thus, respondent has failed to point to any existing case law suggesting that by permitting respondent to file a response, the court forfeited its opportunity to refuse to consider

all or part of that response, nor has the court found any such case law.

## C. Waiver of Procedural Default

■ The procedural default defense often is used by the state in habeas proceedings. The purpose of the procedural default defense is to prohibit the applicant from raising an issue in his or her application for the writ of habeas corpus if the applicant did not comply with the procedural requirements during the trial. The procedural default defense frequently is raised in cases in which the applicant failed to make an objection at the time the error was committed; typically, as in the present case, applicant has failed to comply with the state's contemporaneous objection rule. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

The Fifth Circuit has made it clear that the procedural default defense is waivable. Specifically, the court repeatedly has held that procedural defenses are not a matter of subject matter jurisdiction. As a result, failure by the state to raise a procedural defense at the district court level ordinarily constitutes a waiver. *See, e.g., Barksdale v. Blackburn,* 670 F.2d 22 (5th Cir.1982) (discussing waiver of the exhaustion of state remedies defense). Waiver of the procedural default defense is known as a *Washington* waiver, named after *Washington v. Watkins,* 655 F.2d 1346, 1368 (5th Cir.1981), *cert denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982), in which the court held that since the state did not make the procedural default argument in the district court, it was barred from making the argument in the appellate court. *See id.*

In *Wiggins v. Procunier,* 753 F.2d 1318 (5th Cir.1985), the Fifth Circuit held that the state could raise the procedural default argument at any time during the district court proceedings. *See Id.,* at 1321. This holding distinguishes the procedural default defense from an affirmative defense, which is waived if it is not plead in the original answer. Fed.R.Civ.P. 8(a). Although the trial court opinion is not reported, the appellate court opinion suggests that the district judge ordered the state's answer stricken for untimeliness. *Id.* At some later point in the pro-

ceedings, the district court addressed the issue of procedural default. Applicant argued that the state was powerless to raise the issue of procedural default, *i.e.*, that because the procedural default defense had not been asserted in the answer, it was forever waived, and therefore applicant should not have been required to show cause and prejudice. The Fifth Circuit rejected applicant's argument, and found that because the trial court addressed the issue of procedural default, it was not waived. *Wiggins* demonstrates that if the federal district court permits respondent to make the procedural default defense arguments at any time during its proceedings, the Fifth Circuit can review the procedural default defense.

*Wiggins* does not, however, address the issue of the circumstances in which a district court can deem the procedural default defense to have been waived as a sanction for respondent's repeated failure to comply with time limits set by the court. In *Wiggins*, the Fifth Circuit explained that a *Washington* waiver should not be inferred from "so technical a breach by the state." *Id.*, at 1321. The present case is easily distinguished from *Wiggins*, because in this case the breach by respondent, the state, is not merely technical; rather, respondent has engaged in a pattern of delay and misrepresentation. Thus, *Wiggins* does not limit the district court's power to find that waiver of the procedural default defense is a sanction appropriate to the existing situation. A contrary interpretation of *Wiggins* would be unlikely in that it would strip the district court of power to control respondent, no matter how egregious its behavior in any habeas proceeding.

### D. Equitable Considerations

In *Withrow v. Williams*, —— U.S. ——, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993), Justice O'Connor explained in her concurrence that "[c]oncerns for equity ... resonate throughout our habeas jurisprudence." *Id.*, at ——, 113 S.Ct. at 1757. Justice O'Connor further instructed that the procedural default defense is also governed by equitable princi-

ples. *Id.* (citing *McClesky v. Zant*, 499 U.S. 467, ——, 111 S.Ct. 1454, 1468, 113 L.Ed.2d 517 (1991)). Thus, because both the remedy and the defense are equitable in nature, equitable arguments have been considered in deciding whether to grant applicant's motion. In the present case, equity suggests that the motion for waiver should be granted.

█ Applicant's motion asks the court to deem the procedural default defense to be waived. In essence, the court must decide whether it would make sense to permit the respondent to use a defense which prohibits the court from reaching the merits of applicant's case because the applicant failed to comply with procedural requirements, such as the contemporaneous objection rule, when respondent has itself not complied with the procedural requirements of this court. In this case, respondent is complaining about behavior on the part of the applicant which is similar to its own behavior. No reason for permitting respondent to proceed with the procedural default defense can be perceived in light of respondent's continued refusal to comply with the procedural requirements in this court. It would be nonsensical to hold applicant, an indigent prisoner on death row with court-appointed trial counsel, to a higher standard than that to which we hold respondent, the State of Texas, with all of its intellectual and financial resources.

Further, the procedural errors made by applicant's attorney were made during trial, when counsel had minimal time to consider whether or not to make an objection. Thus, applicant's procedural errors are the kind of mistake that could be expected during a complicated capital murder trial.[12] The respondent, on the other hand, has disregarded deadlines of which it had notice for days, if not weeks or months. That respondent had time to consider whether or not to comply with court-imposed deadline, but failed, repeatedly, to file either an answer or a motion for an extension of time, suggests a willful disregard for court procedure.

---

12. Considering the fact that one of applicant's attorneys spent about seventy hours preparing for trial, and the other spent about twenty hours preparing for trial, it comes as no surprise that the court-appointed counsel in this case made several procedural errors during trial. Application at 94 (referencing attached Exhibit R).

In evaluating applicant's motion, it is appropriate to consider the probable result had petitioner been the party dragging its heals and missing deadlines. Rule 9 of the Habeas Corpus Rules states that an application may be dismissed if the applicant delays the filing "unless the petitioner shows that it [the delay] is based on grounds of which he could not have had the knowledge by the exercise of reasonable diligence before the circumstance prejudicial to the state occurred." Rules Governing § 2254 Cases, Rule 9, at 266 Fed.Civ.Jud.P. (1993). Thus, if applicant delays unnecessarily, the case could be dismissed. As has been stated previously, summary granting of the writ has not been requested, and shall not be granted. However, given the harsh results that would be likely to ensue if an applicant for the writ of habeas corpus failed to comply with procedural requirements in a habeas proceeding, justice would not be served if the court failed to sanction respondent in some fashion.

### III. Conclusion

Having considered the *Frick* precedent, which states that a district court may disregard an untimely response, along with the *Washington* precedent discussed above, which demonstrates that the procedural default argument is waivable, it is has been determined that deeming respondent's procedural default defenses to have been waived is a sanction available to the court; the equitable considerations indicate that the sanction is an appropriate response given the circumstances of this case.

After due reflection, it has been decided that granting applicant's motion, deeming any procedural default defenses offered by respondent to be waived, is the preferable method of addressing the current situation because the remedy, waiver of the procedural default defense, parallels the problem, respondent's failure to comply with this court's procedures. It is clear that in any other non-habeas civil action, default judgement would be a likely remedy for ongoing delay by a party; however, default judgement is inappropriate in a habeas proceeding. Thus, a hearing on the merits of applicant's writ of habeas corpus will be held, but the court will deem any procedural default defense to have been waived.

Respondent has previously filed a motion for summary judgement. However, considering this court's decision on applicant's motion for waiver, summary judgement would be inappropriate at this time, because several material issues of law and fact remain to be decided. Based on the foregoing, it is

**ORDERED** that applicant's motion for waiver shall be, and it is hereby, **GRANTED.** Accordingly, it is

**ORDERED** that respondent's motion for summary judgement shall be, and it is hereby, **DENIED.** Finally, it is

**ORDERED** that respondent's September 27, 1993, motion for an extension of time shall be, and it is hereby, **DENIED.**