An instruction on a lesser-included offense is proper when: (1) the
lesser-included offense is included within the proof necessary to establish the
offense charged; and (2) there is some evidence in the record that would permit
a jury to rationally find 















     

Opinion issued September 27,
2007

 

 

 



 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-06-00062-CR

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



DAGMAR FEHRMANN GAHAGAN, Appellant

 

V.

 

THE STATE OF TEXAS,
Appellee

 

 



On Appeal from the 338th District Court

Harris County, Texas

Trial Court Cause No. 995206

 

 



O P I N I O N

 

After an
incident that resulted in the death of Dennis Edwards, appellant Dagmar Gahagan
was charged with and tried for murder. 
At the close of evidence, the jury was asked to determine whether the
State had proven beyond a reasonable doubt that Gahagan committed either murder
or the lesser included offense of manslaughter. 
The jury found Gahagan guilty of manslaughter and assessed a sentence of
five years’ imprisonment.  Tex. Pen. Code Ann. § 19.04(a) (Vernon
2003).  Following her conviction, Gahagan
noticed this appeal.  

Gahagan
contends that her conviction must be reversed because (1) the evidence was
legally and factually insufficient to support the jury’s verdict; (2) the trial
court erred in submitting an instruction on manslaughter to the jury; and (3)
the trial court abused its discretion in denying her motion for new trial due
to jury misconduct.  Finding no error, we
affirm.  

Background

 

Gahagan and
Edwards’ sister, Scarlet Robinson, met in 2002 as neighbors at an apartment
complex in Houston.  They became friendly with each other and
occasionally visited or went shopping or to church together.   

Edwards met
Gahagan through Robinson shortly after he moved to Houston.  Robinson had invited Edwards to Houston so that she could
help him overcome his drinking problem. 
He had just divorced his wife of 25 years and “was in a really bad
place.”  Robinson helped her brother
regain his health and find a job.

Edwards and
Gahagan began meeting at the apartment complex pool and going out for meals or
to nightclubs.  As he spent time with
Gahagan, Edwards began drinking again. 
As Gahagan and Edwards spent more time together, Gahagan began
complaining to Robinson about Edwards’ behavior.  Robinson reminded Gahagan about her brother’s
problem with alcohol and expressed concern about his relapse.  Despite Gahagan’s complaints, she continued
to go out with Edwards.  She also loaned
or gave him money from time to time, and gave him a cross on a gold chain as a
gift.

Gahagan also
gave Edwards one of her two guns, a snub-nosed revolver that she found too
difficult to handle.  Gahagan testified
that she owned the guns, which she kept for self-defense, when she moved into her
apartment in 1999.  The gun she kept was
a Lady Smith & Wesson revolver that she had received as a gift from her
fourth ex-husband.  

By all
accounts, Gahagan’s relationship with Edwards was a rocky one.  According to Gahagan, their difficulties
stemmed mostly from their difference of opinion on the closeness of their
relationship.  She claimed that Edwards
would try to pressure her into having a more serious relationship.  Occasionally, Gahagan and Edwards went for
days or weeks without seeing or speaking with each other.

After
several months in Houston, Edwards decided to return
to Florida.  When he told Gahagan about his plans, she
threatened to kill him.  Edwards
mentioned the threat to his sister, and she confronted Gahagan about it.  Gahagan admitted to Robinson that she had
made the threat to Edwards, but explained that she had used the term as a
figure of speech and assured Robinson that she would never follow through on
it.  

After
Edwards spent a couple of months in Florida, his Houston employer called to
tell him that his old job was still open and asked him to return.  Shortly after Edwards returned to Houston, he and Gahagan
resumed their relationship.  

In early
July 2004, Edwards asked Gahagan for a $1,000 loan to help him pay alimony and
rent.  Gahagan issued Edwards an ultimatum:
either take the $1,000 or stay in the relationship with her.  Edwards looked at her for a moment, then put
the money in his pocket and left. 
Edwards’ daughter testified that, during the same time frame, Gahagan
questioned her extensively about Edwards, and her father indicated he was
concerned about his personal safety around Gahagan.  

The evening
of July 22, 2004, Edwards went to Gahagan’s apartment and presented her with a
sealed envelope containing a handwritten letter expressing his disappointment
with her behavior of late and his inability to trust her.  The letter also stated that he had decided to
end their relationship.  Gahagan brought
the letter into the kitchen and stood at the kitchen counter while Edwards sat
on a bar stool across the counter from her. 
She testified that she opened the envelope and began to read the letter,
but set it down when Edwards asked her not to read it then.  According to Gahagan, she did not read the
letter or have any knowledge of its contents until shortly before her trial.

Following
this exchange, Gahagan testified, she and Edwards discussed a series of
criminal incidents that had occurred at the apartment complex.  Gahagan discussed her safety concerns with
Edwards and that the pinched nerve, carpal tunnel syndrome, and arthritis she
had in her hands made it difficult for her to handle her gun.  Gahagan explained that Edwards had trouble
understanding her description of the problem and asked her to demonstrate.  Gahagan retrieved the gun from her
nightstand, opened the cylinder, pushed on the ejector, and unloaded the
bullets into her hand.  She did not,
however, check to see whether the cylinder was empty or count how many bullets
had dropped out.  Then, Gahagan returned
to the main living area and walked back to the kitchen counter across from the bar
where Edwards was sitting. 




Gahagan
described her next actions as follows:

Q:      Were you paying any attention to where you
were pointing the gun?  Were you
conscious of where you were pointing the gun?

 

A:      In Dennis’ direction, yes.  

 

*  *  *

 

Q:      Do you know where your forefinger was?

 

A:      At the trigger.

 

*  *  *

 

Q:      Do you know, can you tell the ladies and
gentlemen what your thumb was doing?

 

A:      It was pulling the hammer back.[1]  

 

While
Gahagan was pulling the hammer back, she testified, the gun
suddenly and unexpectedly discharged.  Edwards,
still in the bar stool, slumped over, dropping his head onto his hands, which
were resting on the bar. 

At first,
Gahagan thought he was joking, but then realized that the gun had actually
discharged.  After making this
realization, she opened the cylinder, took the casing out of the gun, returned
to her nightstand, placed the casing in the gun case, and zipped the case shut.  She admitted that she did so to “get rid of
[the casing] . . .” because “[i]t wasn’t supposed to be in the gun.”  

While still
by the nightstand, Gahagan also called 911. 
Gahagan told the 911 operator that both she and Edwards had held the
gun, but conceded in her testimony that Edwards did not hold the gun either
before or during the shooting.  The 911
recording also revealed that Gahagan refused to perform CPR, locate the wound,
or try to render any aid to Edwards.  At
trial, she explained that she refused to do so because he “was bleeding badly”
and had “lost too much blood to be still alive.”  

After
completing the call, Gahagan returned to the bar area where Edwards’ body was
and placed the gun, with the cylinder still open, in his hand.  When asked why she did this, Gahagan claimed
that it was a “mistake . . . [an] unexplainable reaction to . . . being in
shock.”  Gahagan also testified that she
became physically ill after seeing Edwards’ condition and washed her hands and
face to clean herself before the paramedics and police arrived.  

When the
paramedics arrived, they found that Edwards had already died.  The police arrived shortly after the
paramedics.  In their investigation of
the apartment, they discovered Edwards’ letter to Gahagan opened to the second
page and the empty shell Gahagan had placed inside the closed gun case in the
nightstand.  They also tested Gahagan’s
hands for gunshot residue, but were unable to obtain enough material to yield a
conclusive result.  

The coroner
determined that Edwards died from the gunshot wound.  The coroner’s examination revealed that the
bullet entered on the right side of Edwards’ lower lip and traveled to the back
of his body at a horizontal angle until it lodged in his upper spine.  The coroner testified that the lack of any
contact wound or stippling indicated that the gun’s muzzle was at least one and
a half feet from Edwards when it was fired. 

An examiner
from the Houston Police Department crime lab did not locate any full or partial
fingerprints on the gun, casing, or bullets. 
Moreover, evidence from the firearms lab showed that the safeties on the
gun worked and would have prevented an accidental discharge.  The State’s witness from the firearms lab
demonstrated for the jury that the gun would not fire unless someone pulled the
trigger.  Gahagan’s firearms expert
likewise testified that the safeties on the gun functioned properly and that
the gun would not fire without pulling the trigger “all the way back.”

Gahagan has
significant experience with firearms. 
Gahagan’s fourth ex-husband testified that Gahagan had accompanied him
to the firing range for practice approximately once every two weeks for a
five-year period and occasionally at other times during their fifteen-year
marriage.  According to her ex-husband,
Gahagan could hit a target and knew her physical limitations with a gun.  Gahagan conceded that she knew never to point
a weapon at anyone whether it was loaded or not, and that she could have
demonstrated her problem in handling the gun without pointing it at Edwards.  

At the same
time, the evidence shows that Gahagan had some difficulty handling a gun.  The pinched nerve, carpal tunnel syndrome,
and arthritis in her hands cause her to suffer numerous physical symptoms,
including a loss of fine motor skills, numbness, tingling, and weakness in the
thumb, index, and middle fingers. 
Gahagan’s ex-husband explained that “one of the reasons that we would go
[to the shooting range] is, was to see that she could still handle the
weapon.  Her arthritis in her hand had
gotten worse over the years and we wanted to make sure she could still handle
it safely.”  Her symptoms “waxed and
waned,” however, and the record does not reveal the extent of her impairment on
the day of the incident.  

Gahagan’s
firearms expert also testified in support of Gahagan’s claim that the gun
discharged inadvertently.  He explained
that the firing pin impression on the cartridge that had contained the fatal
bullet was “very, very light,” which was consistent with an accidental
discharge of the weapon.  He conceded,
however, that the gun could not fire without pulling the trigger all the way
back and an inadvertent discharge was only one of many possible explanations
for a light firing pin impression.  

Discussion

A.      Sufficiency of Evidence in
Support of Manslaughter Conviction

1.                
Standards
of Review 

We apply two
distinct standards in addressing Gahagan’s challenges to the sufficiency of the
evidence.  In reviewing the legal
sufficiency challenge, we view the evidence in the light most favorable to the
verdict to determine whether any rational fact finder could have found the
crime’s essential elements beyond a reasonable doubt.  Wesbrook v. State, 29 S.W.3d 103, 111
(Tex. Crim. App. 2000); King v. State,
29 S.W.3d 556, 562 (Tex.
Crim. App. 2000). We may not re-weigh the evidence and substitute our judgment
for that of the fact finder.  King, 29 S.W.3d at 562.  

In reviewing
the factual sufficiency challenge, we view the evidence in a neutral
light.  Ladd v. State, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999).  We will set aside the verdict only if (1) the
evidence is so weak that the verdict is clearly wrong and manifestly unjust or
(2) the verdict is against the great weight and preponderance of the evidence. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000).  We may not conclude that the
evidence is factually insufficient simply because we disagree with the
verdict.  Watson v. State, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006).  As the determiner of the credibility of the
witnesses, the fact finder may choose to believe all, some, or none of the
testimony presented.  Cain v. State, 858 S.W.2d 404, 407 n.5
(Tex. Crim. App. 1997).   

2.                
Manslaughter

 

A person
commits manslaughter if she recklessly causes the death of an individual. Tex. Pen. Code Ann. § 19.04(a) (Vernon
2003). A person acts recklessly with respect to circumstances surrounding her
conduct or the result of her conduct when she is aware of, but consciously
disregards, a substantial and unjustifiable risk that the circumstances exist
or the result will occur. Id. § 6.03(c)
(Vernon 2003). The risk must be of such a nature and degree that its disregard
constitutes a gross deviation from the standard of care that an ordinary person
would exercise under all circumstances as viewed from the actor’s standpoint.  Id.; Garza
v. State, 50 S.W.3d 559, 564 (Tex. App.—Houston [1st Dist.] 2001,
no pet.). “At the heart of reckless conduct is conscious disregard of the risk
created by the actor’s conduct.” Lewis v. State, 529 S.W.2d 550, 553
(Tex. Crim. App. 1975).   

The gist of
Gahagan’s legal and factual sufficiency challenges concerns whether the
evidence supports the jury’s finding of recklessness, the level of intent
required to support a manslaughter conviction. 
Proof of a culpable mental state generally relies on circumstantial
evidence. Dillon v. State,
574 S.W.2d 92, 94 (Tex. Crim. App. 1978). 
Whether the accused is actually aware of a risk or simply should be
aware of it is for the jury to determine based on all the circumstances it
accepts as proven.  Id. 
The issue, then, is whether, in light of all the circumstances, a
rational trier of fact could infer that Gahagan was aware of the risk created
by her conduct.  

In
determining whether the evidence supports a finding of recklessness, a
statement that a defendant did not intend to kill the victim “cannot be plucked
out of the record and examined in a vacuum.” Godsey v. State, 719 S.W.2d
578, 584 (Tex. Crim. App. 1986); Martinez v. State, 16 S.W.3d 845, 847
(Tex. App.—Houston
[1st Dist.] 2000, pet. ref’d).  Courts
have upheld jury findings that a defendant consciously disregarded a
substantial and unjustifiable risk in numerous situations involving allegedly
accidental discharge of a firearm.  See, e.g., Guzman v. State, 188 S.W.3d 185, 193–94 (Tex. Crim. App. 2006)
(rejecting appellant’s argument that, because he thought gun was unloaded after
he had removed clip, he did not actually consciously disregard known risk;
appellant testified that he was fully aware of fact that pointing gun at
someone’s head and pulling trigger is very dangerous act, constituting
admission that he had reckless state of mind); Lugo v. State, 667 S.W.2d 144, 149 (Tex. Crim. App. 1984)
(concluding that jury could have reasonably found defendant consciously
disregarded substantial and unjustifiable risk based on his testimony that he was unaware rifle was loaded when he
cocked and pointed rifle at victim in attempt to persuade her to relinquish car
keys); Hayes v.
State, 124 S.W.3d 781, 788 (Tex.
App.—Houston [1st Dist.] 2003) (holding evidence was legally and factually
sufficient for jury to find defendant was reckless on showing that defendant
held gun he knew was loaded in non-dominant hand, pointed gun toward victims,
closed his eyes, and began shooting), aff’d,
161 S.W.3d 507 (Tex. Crim. App. 2005); In re E.U.M., 108 S.W.3d 368, 371 (Tex.
App.—Beaumont 2003, no pet.) (holding that evidence was legally sufficient for
jury to find that juvenile engaged in conscious risk creation even if he
mistakenly thought that shell was not in chamber and gun would not discharge
when he pulled trigger); Davis v. State,
757 S.W.2d 386 (Tex. App.—Dallas 1988, no pet.) (affirming manslaughter
conviction for defendant who alleged he was just playing with gun, did not know
it was loaded, and that it accidentally discharged); Yates v.
State, 624 S.W.2d 816, 817 (Tex. App.—Houston [14th Dist.] 1981,
no pet.) (affirming
manslaughter conviction for defendant who, after killing victim in “quick-draw”
contest, admitted to knowingly pointing loaded gun at victim but claimed that
it accidentally discharged); Daniels v.
State, No. 01-93-00485-CR, 1994 WL 150900, *2–3 (Tex. App.—Houston [1st Dist.] Apr.
28, 1994, pet. ref’d) (not designated for publication) (affirming manslaughter
conviction of defendant who claimed he shot wife accidentally because he did
not know gun was loaded; evidence showed that defendant was familiar with guns
and jury could reasonably find that defendant knew gun was loaded because
examination of weapon showed that bullets were visible when placed inside and
there was expert testimony that gun could not discharge accidentally).

Gahagan
relies on Thomas v. State, 699 S.W.2d
845 (Tex. Crim. App. 1985), and Branham
v. State, 583 S.W.2d 782 (Tex. Crim. App. 1979), to contend that the
evidence is legally insufficient to convict her of manslaughter.[2]  But Thomas
supports upholding the verdict in this case.  
There, as here, the defendant claimed that the gun accidentally
charged.  The Court observed, however,
that the analysis of whether the defendant’s culpable mental state amounted to
recklessness or criminal negligence requires consideration of all the evidence,
not just whether the defendant pointed a loaded gun at the victim and whether
the weapon accidentally discharged.  Thomas, 699 S.W.2d at 849.  Thus, evidence that a defendant is familiar
with guns and their potential for injury and that the defendant pointed the gun
at the victim “indicates a person who is aware of a risk created by that
conduct and disregards the risk.”[3]  Id. at
850.  

The facts
in Branham are distinguishable.  The defendant in that case, who had never
handled a gun before the incident that resulted in the victim’s death,
testified that the gun accidentally discharged when “somebody from behind
grabbed [her].”  Branham, 583 S.W.2d at 784 (quoting defendant’s testimony).  Under those circumstances, the court
concluded that the trial court erred in failing to charge the jury on
criminally negligent homicide.  Id.
at 785.

Davis most closely resembles the circumstances presented
here.  757 S.W.2d at 387-88.  The appellant testified that, while sitting
in his truck with his girlfriend, he picked up a gun he kept in the beer holder
and began “playing with” the gun and spinning it on his index finger.  Id. at
387.  The gun discharged, striking his
girlfriend between the eyes and killing her. 
Id.  The appellant explained that he did not
know the gun was loaded.  Id.  Nevertheless, the jury found that he had
committed manslaughter.  Id.  

On appeal,
the appellant contended that there was no evidence that he (1) knew the gun was
actually loaded, or (2) purposefully pointed the gun at the victim.  At most, he asserted, the evidence supported
a finding only that he acted with criminal negligence.  Id.  

The court
of appeals rejected this assertion.  Id.
at 388.  Pointing to the appellant’s
admission that he understood the risk involved with handling a handgun with
another person in his immediate vicinity, the court held that this evidence
provided sufficient support for the jury’s finding that the appellant was aware
of and consciously disregarded the risk involved in handling the gun around the
victim.  Id.
 The Davis
court observed that “that the precise circumstances
of a death very commonly surface only in the testimony of the survivor who, if
he be governed by the forces of human nature, will be wont to cast his
testimony in a light most favorable to himself.”  Id.

The
record in this case shows that Gahagan, like the appellant in Davis,
was familiar with guns and knew the risks involved in handling them.  Further, although some of her testimony
equivocated on the issue, Gahagan admitted that she was aware that she was
pointing the gun in Edwards’ direction.  She
also conceded that she knew from her experience in handling guns that one
should never point a gun at anyone whether it is loaded or not.  The record also contains conflicting
evidence from the firearms experts concerning whether the gun could have accidentally
discharged as Gahagan claimed.  A reasonable jury could have chosen to disbelieve any
or all of Gahagan’s benign description of the incident and instead put stock in
the circumstantial evidence surrounding the incident—such as Gahagan’s
familiarity with guns and her actions immediately following the shooting—which
supports a reasonable inference that Gahagan was conscious of the risk created
by her actions.  See Conroy v. State, 843 S.W.2d 67, 70 (Tex. App.—Houston
[1st Dist.] 1992, pet. ref’d) (trier of fact may use any of facts in evidence
which prove existence of requisite intent); Yates, 624 S.W.2d at 817 (observing that testimony from
investigative detective that trigger was type that would discharge only with
deliberate pull conflicted with appellant’s claim that gun accidentally
discharged and supported manslaughter conviction); see also In re E.U.M, 108 S.W.3d at 371 (observing that juvenile’s
attempt to shift responsibility in changing story about circumstances of
homicide indicated that she acted with guilty knowledge and supported
recklessness finding); Davis, 757
S.W.2d at 387 (defendant initially concealed gun, victim’s body, and clothing,
disclosing whereabouts only after police interrogation).  Accordingly, we conclude that the evidence is
legally and factually sufficient to support the manslaughter conviction.

B.      Submitting
Manslaughter to the Jury as a Lesser Included Offense

 

Gahagan
also claims that the trial court erred in submitting the lesser included
offense of manslaughter as requested by the State.  “When reviewing charge errors, an appellate
court must undertake a two-step review: first, the court must determine whether
error actually exists in the charge, and second, the court must determine
whether sufficient harm resulted from the error to require reversal.”  Abdnor
v. State, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994).  A party is entitled to a lesser included
charge when (1) it is a lesser included offense of the offense charged in the
indictment, and (2) the record includes some evidence to permit a rational jury
to find that, if the defendant was guilty, she was guilty only of the lesser
offense but not guilty of the greater.  See McKinney
v. State, 207 S.W.3d 366, 370 (Tex. Crim.
App. 2006); Guzman v. State, 188
S.W.3d 185, 188 (Tex. Crim. App. 2006); Salinas v. State, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005).

Manslaughter
is a lesser included offense of murder.  McKinney,
207 S.W.3d at 370; Moore v. State,
969 S.W.2d 4, 10 (Tex. Crim. App. 1998); see
Tex. Code Crim. Proc. Ann. art.
37.09(3) (Vernon 2006).  Gahagan
challenges only the trial court’s conclusion that the evidence presented
satisfied the second prong,
asserting that the evidence did not support submission of the charge.  

Evidence that
Gahagan was experienced in handling firearms, knew her own physical
limitations, and was aware she was pointing the gun in Edwards’ direction when
it accidentally discharged would permit a jury rationally to find that
appellant was guilty only of manslaughter as the lesser included offense of the
murder alleged in the indictment. 
The issue of whether the evidence might, as Gahagan contends, permit a
finding of criminal negligence—a finding that Gahagan did not ask the jury to
make—has no bearing on that conclusion.  See Conroy, 843 S.W.2d at 71–72 (holding
that trial court erred in failing to include defendant’s requested instruction
on criminally negligent homicide in jury charge while also concluding that jury
could have rationally found appellant was aware of risk of death associated
with his actions, that risk was substantial and unjustifiable, and that he
consciously disregarded risk).  Accordingly,
the trial court did not err in submitting the charge on manslaughter.  See
Hampton v. State, 109 S.W.3d 437, 440 (Tex. Crim. App. 2003).  

C.      Jury
Misconduct

In her final issue, Gahagan seeks reversal of her conviction
on the claim that the jury engaged in misconduct by receiving “other evidence”
after retiring to deliberate. 
Specifically, Gahagan, through counsel, averred that one of the jurors
volunteered that, while he was initially inclined to vote “not guilty,” he
changed his mind after the jurors experimented with the gun in evidence and
tested the gun’s operation.  The trial
court’s order indicates that it considered the proffered evidence and argument
in her amended motion concerning this issue before denying her request for new
trial.

To be entitled to a new trial based on Rule 21 of the Texas
Rules of Appellate Procedure, the defendant must show that the jury actually
received “other evidence” that harmed her defense.  Tex. R.
App. P. 21.3(f); Bennett v. State, 742 S.W.2d 664, 676 (Tex. Crim. App. 1987), vacated on
other grounds, 486 U.S. 1051, 108 S. Ct.
2815 (1988); Guice v. State,
900 S.W.2d 387, 389 (Tex. App.—Texarkana 1995, pet. ref’d).  We review the trial court’s decision to deny
Gahagan’s motion for new trial on this ground for an abuse of discretion.  See Lewis v. State, 911 S.W.2d 1, 7 (Tex. Crim. App.
1995).

Texas Rule of
Evidence 606(b) provides that, “[u]pon an inquiry into the validity of a
verdict or indictment, a juror may not testify as to any matter or statement
occurring during the jury’s deliberations, or to the effect of anything on any
juror’s mind or emotions or mental processes, as influencing any juror’s assent
to or dissent from the verdict or indictment.” 
Tex. R. Evid. 606(b).  The rule, however, allows a juror (1) to
testify about “whether any outside influence was improperly brought to bear
upon any juror; or (2) to rebut a claim that the juror was not qualified to
serve.”  Id.   In short, a new trial is warranted only when
“other evidence” involved in the alleged jury misconduct is an influence
external to both the jury and the deliberations brought to bear on a juror.   See Kendall v. Whataburger, 759
S.W.2d 751, 755 (Tex. App.—Houston [1st Dist.] 1988, no writ).  The issue, then, is whether the jury’s alleged
experimentation with the gun in evidence constitutes an external
influence.  




The Texarkana court of appeals
ably summarized the law applicable to this issue as follows:

Generally
it is improper for jurors to conduct experiments or demonstrations in the jury
room after beginning deliberations. 
Jurors may, however, in discussing the evidence among themselves, arrive
at an understanding of the evidence by movements of their own bodies or by use
of articles admitted in evidence which are taken with them.  A conscious and contrived experiment that
does not come from the witness stand deprives the accused of the right of
cross-examination or counsel, but not every demonstration requires the court to
grant a new trial.  A reviewing court
need not grant a new trial absent a showing that the jurors during the
experiment discovered and were influenced by some new fact hurtful to
the appellant.  Whether the jurors
received new and harmful evidence during their deliberations is a fact issue to
be decided by the trial court and a question of degree.

 

Guice, 900 S.W.2d at 389
(citations omitted) (emphasis in original). 


          The
juror’s statement, as relayed by defense counsel, is too vague to demonstrate
that any outside influence affected the juror, or that the jurors did anything
more than examine an admitted exhibit more closely so as to apply information
learned at trial.[4]  The trial court acted within its discretion
in denying Gahagan’s motion for new trial.




Conclusion

We conclude that legally and factually
sufficient evidence supported the verdict and that the trial court did not err
in charging the jury or in denying a new trial. 
We therefore affirm the judgment of the trial court.  

   

                                                          Jane Bland

                                                          Justice

 

Panel consists of Chief Justice Radack
and Justices Alcala and Bland.

Publish.  See
Tex. R. App. P. 47.2(b).

 











[1] At the same time, Gahagan also
testified that she was “not paying a lot of attention” as to how she held the
gun or where she pointed it.  





[2] We note that, in each of these cases, the defendant
claimed error because the trial court refused to submit to the jury the
defendant’s requested charge on criminally negligent homicide.   See
Thomas v. State, 699 S.W.2d 845, 847 (Tex. Crim. App. 1985); Branham v. State, 583 S.W.2d 782 (Tex. Crim. App.
1979).  In contrast to the standard of
review for factual sufficiency, which requires deference to the credibility
determinations of the fact finder and entails comparison of the evidence which
tends to prove the existence of the disputed elements to the evidence which
tends to disprove it, the standard for reviewing a claim of whether a defendant
is entitled to a lesser included offense instruction requires only that the
record contain some evidence, regardless of its weakness or strength, that
would permit a jury to rationally find that, if the defendant was guilty, she
was guilty only of the lesser offense.  Compare Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000) and Watson v. State, 204
S.W.3d 404, 417 (Tex. Crim. App. 2006) (factual sufficiency) with Saunders v. State, 840 S.W.2d 390,
391 (Tex. Crim. App. 1992) (propriety of including instruction on lesser
included offense).  This substantial
difference in the standard of review makes these cases of limited utility in
analyzing Gahagan’s legal and factual sufficiency challenges.

 





[3] Evidence that the defendant in Thomas was aware the weapon was loaded, whereas here, Gahagan
testified that she mistakenly thought the gun was unloaded, is not a material
distinction under the facts presented. 
Gahagan admittedly knew not to point a gun, whether loaded or unloaded,
in anyone’s direction.  This admission
supports a reasonable inference that Gahagan perceived the risk of harm that
her conduct created.  See Moore
v. State, 574 S.W.2d 122, 123 (Tex. Crim. App. 1978).  

 





[4] The State also challenges the competence of Gahagan’s
evidence of alleged juror misconduct and the timeliness of her motion for new
trial.  Our disposition makes it
unnecessary for us to reach these issues.