

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NOS. 02-08-287-CR
## 02-08-288-CR
## 02-08-289-CR

JOSE MONTOYA                                                      APPELLANT

V.

THE STATE OF TEXAS                                                      STATE

------------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

Appellant Jose Montoya appeals his convictions for two counts of aggravated assault and one count of murder. In two points, Montoya contends that (1) the trial court erred by failing to give proper jury instructions and (2) the trial court abused its discretion by admitting a videotape recording of his oral confession. We affirm.

------------

[1] *See* Tex. R. App. P. 47.4.

## II. Factual and Procedural Background

### A. The Incident

In June 2007, Montoya lived in an apartment with Rosa Lopez, Rosa's adult daughter Claudia Escoto, and another man named Isaac Scott.[2] On the night of June 2, Rosa and Claudia were in one of the apartment's bedrooms,[3] discussing the need to move out if Montoya would not leave, when they heard a knock at the bedroom door. Rosa opened the door to see Montoya standing there.

After a brief discussion, in which Rosa told Montoya that he needed to move out, Montoya grabbed Rosa by the neck and hit her in the face multiple times. Rosa fell back onto the bed and attempted to defend herself with her feet. Montoya then pulled a knife from behind his back and stabbed Rosa a total of nine times on her hands, arms, and back. In an effort to protect her mother, Claudia interceded and Montoya stabbed her a total of seven times on her arms and stomach. Claudia yelled for Isaac, who was asleep in the kitchen, to come and help. When Isaac came into the room, he asked, "What's happening, [Montoya]?" Montoya turned and fatally stabbed Isaac in the chest.[4] As Montoya approached Rosa again, Rosa said,

---

[2] Rosa's son and Claudia's eight-month-old daughter also lived in the apartment.

[3] Claudia's eight-month-old daughter was also in the room.

[4] Medical evidence showed that Isaac died from a stab wound that penetrated five inches into his chest, through the fourth left rib, the top left lung, and the aorta.

2

"By God's love, what have we done to you? Be fearful of God. Think about your children. You are getting yourself into a big problem." While Rosa was speaking, Claudia managed to take the knife from Montoya. Montoya then left the apartment.

Officers with the Carrollton Police Department apprehended Montoya later that night, arrested him, and took him to jail. After taking Montoya's fingerprints and photograph, detention officers placed him into the jail's detox center. About sixteen hours later, Carrollton Police Detective Angela Lundy interviewed him, using an interpreter. After Detective Lundy read Montoya his *Miranda*[5] rights, he confessed on videotape to the details of the attacks.

During the interview, Montoya confessed to the following. He and Claudia were in a relationship that Rosa did not approve of. Rosa wanted Montoya to move out of the apartment. On the night of the incident, he had drunk six or seven beers and done "about 20" in cocaine.[6] He had overheard Rosa and Claudia making plans to get him out of the apartment and responded by taking a knife from the kitchen. After being admitted into the bedroom, he had asked Rosa why she was "trying to kick [him] out of the apartment." Rosa responded that "that was what [he] deserved . . . ." Rosa's response made him angry, so he attacked her. He attacked Claudia and Isaac when they tried to intervene. He did not have any problems with Isaac

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

[6] It is unclear from the record whether "about 20" is referring to weight or dollars.

3

and only stabbed him because Isaac had tried to stop him from attacking Rosa and Claudia. He "regret[ted] not having done what [he] wanted to do with whom [he] wanted to instead [he] did it to the person who did not deserve it." Finally, when asked if he wanted to kill Rosa, Montoya responded, "The problem was with Rosa, maybe not kill her, I don't know."

The State charged Montoya with two counts of aggravated assault and one count of murder.

**B. Trial on the Merits**

At trial, in addition to Rosa and Claudia both testifying to the facts stated above, Sergeant Joel Payne with the Carrollton Police Department testified that on June 2, he responded to a dispatch call regarding an aggravated assault. On his way to the location of the assault, he stopped a vehicle matching the description of the suspect's vehicle. When he ordered the driver, later identified as Montoya, to step out of the car, Montoya refused, asking in English, "Why are you stopping me?" At some point, Montoya drove off, and Sergeant Payne pursued him in his patrol unit. During the chase, Montoya's vehicle collided with a wall. Montoya then took off on foot. Police officers gave chase, apprehended Montoya, and placed him under arrest.

James Robertson, a detention officer for the Carrollton Police Department, testified that he assisted in Montoya's book in process. He stated that during intake, Montoya smiled, laughed, and said, "I stabbed them, and I killed him" and "[s]he

4

deserved this." When asked if he spoke Spanish, Robertson responded, "No." When asked if he had any difficulty communicating in English with Montoya, Robertson again responded, "No."

Detective Lundy testified that she spoke with Montoya about sixteen hours after the offense occurred. She stated that she read Montoya his *Miranda* rights before questioning him. When asked about her interaction with Montoya during questioning, Detective Lundy responded:

> Q. Now, do you—did you make any promises to [] Montoya?
>
> A. No, I did not.
>
> Q. Did you threaten him in any way?
>
> A. No.
>
> Q. Did he ever ask to speak to an attorney?
>
> A. No, he didn't.
>
> Q. Did he ever ask to terminate the interview in any fashion?
>
> A. No, he did not.
>
> Q. Do you believe that when you read him his rights that he fully understood them?
>
> A. Yes, I do.
>
> Q. And how did you make sure he understood them?
>
> A. Well, I believe that Mr. Montoya spoke English; but just to make sure that he understood fully what was going on, because these charges were very serious, I provided an interpreter to interpret our interview.

5

Detective Lundy also testified that the interpreter was "an experienced interpreter" who interpreted for the local municipal court. Finally, Detective Lundy stated that Montoya did not seem to be intoxicated or under the influence of drugs when she questioned him.

Outside the presence of the jury, Montoya objected to the admission of the videotaped recording and transcription of his confession, claiming that his confession was not voluntary because he had not waived his *Miranda* rights knowingly, intelligently, and voluntarily. The trial court overruled Montoya's objection, and it allowed the videotape and transcript to be admitted as evidence.

At the close of evidence, Montoya did not request a jury instruction on the voluntariness of his confession, and none was given. A jury found Montoya guilty on all three counts and assessed punishment at fifteen years' confinement for each count of aggravated assault and seventy-five years' confinement for the murder. The trial court sentenced Montoya accordingly.

## C. Procedural History

Montoya filed his notice of appeal and then filed an "Appellant's Motion to Abate for Trial Court's Entry of Mandatory Findings of Fact and Conclusions of Law Regarding Voluntariness of the Appellant's Confession." We abated, and the trial court entered the following findings of fact and conclusions of law:

> I find that the defendant was given all of his rights by Detective Lundy, per Texas Code of Criminal Procedure Article 38.22 Sec. 2 as required for custodial interrogation, and that the rights are contained on

6

the video. These rights were given prior to any questions by Detective Lundy. I find that the defendant understood these rights in a knowing and intelligent way. I find the defendant appeared alert and aware on the video. He did not appear intoxicated or confused in any way. I find that the interview was taken approximately at 4 p.m. and over 16 hours after the offense and arrest of the defendant. He communicated back and forth with Detective Lundy, through the interpreter, a great deal during the interview. There was never a moment where communication broke down or that the defendant appeared confused. He answered appropriately, in proper context, to all the questions he was asked; indicating knowledge and understanding.

I find that the defendant knowingly, intelligently, and voluntarily waived the rights set out in Article 38.22. I find that after a full and complete reading of his 38.22 rights, Detective Lundy sought a waiver of these rights. Detective Lundy asked the defendant, through the interpreter, "Are you willing to tell the detective what happened last night?" I find that the defendant responded precisely, and directly to that question: "Si," translated to 'yes'. I find that the defendant's 1st waiver answer was soft spoken and that Detective Lundy appeared to not have heard the defendant. Therefore she asked again, through the interpreter, for a waiver of his 38.22 rights, "Do you want to tell the detective what happened?" I find that the defendant answered precisely and directly to that request for a waiver of rights, "Si," translated as 'yes'. I find these two questions legally sufficient for a waiver request of 38.22 rights. I find that the defendant understood these two questions as a request for a waiver of his rights. I find the defendant then waived his rights.

I find that the defendant's statement to Detective Lundy, what became State's #102, was voluntarily made. From my viewing of the video, I do not find the interview to be coercive in any fashion. The interview was calm and without confrontation. All the voices were of regular conversational tone. I find the body language of the parties in the interview room to be inconsistent with tension, threats, or coercion. No one yelled at the defendant. No one demanded answers from him. The defendant was not threatened in any way. I find Detective Lundy credible when she testified that no one made any promises to the defendant, or threatened him in any way, and that the defendant did not request an attorney, or request to terminate the interview. In the video itself I find there are no threats, no promises, no request of counsel, or request to terminate the interview. I find that the defendant waived his

7

rights of his own free will. His will was not overcome by the State, indeed the State made no effort to coerce the defendant in any way. I find that the defendant made his statement; State's #102, freely and voluntarily, without threat or promise.

From the totality of the circumstances, I find that the defendant's statement, exhibit #102, was freely and voluntarily made. The statement was made after he received a complete and accurate reading of his rights under TXCCP 38.22, sec. 2, and the warnings are contained in the electronic recording, the video. I find that the defendant knowingly, intelligently, and voluntarily waived the rights set out in 38.22, before any questioning. I find that the defendant gave the statement of his own free will.

This appeal was reinstated following the entry of these findings and conclusions.

### III. Jury Instruction

In his first point, Montoya claims he suffered egregious harm because the trial court did not instruct the jury under sections 6 and 7 of article 38.22 of the Texas Code of Criminal Procedure as to the voluntariness of his statements to Detective Lundy. In response, the State concedes that a section 6 general voluntariness instruction should have been given but argues that Montoya failed to raise any evidence that would have entitled him to a section 7 instruction. We disagree with the State's concession as to the section 6 instruction but agree with its argument as to the section 7 instruction.

#### A. Standard of Review

Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see also Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009). Initially, we must determine whether error

8

occurred.  If it did, we must then evaluate whether sufficient harm resulted from the error to require reversal.  *Abdnor*, 871 S.W.2d at 731–32.

## B.  Applicable Law

A statement of an accused may be used as evidence against him if it appears that it was freely and voluntarily made without compulsion or persuasion.  Tex. Crim. Proc. Ann. art. 38.21 (Vernon 2005).  There are several theories that a defendant may use to argue his statement was not freely and voluntarily made and thus may not be used as evidence against him:  (1) article 38.22, section 6 ("general voluntariness"); (2) *Miranda* as codified in Texas Code of Criminal Procedure article 38.22, sections 2 and 3; or (3) the due process clause.  *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008).  The theory of involuntariness determines whether and what type of a jury instruction is appropriate.  *Id*.  Article 38.22 of the code of criminal procedure governs the admissibility of an accused's written and oral statement that results from custodial interrogation.  *Id.* at 171.  However, section 6 of article 38.22 applies to both an accused's custodial and noncustodial statements, requiring that even noncustodial statements must be voluntary to be admitted.  *Id*. When a claim is raised under article 38.22, a "general" voluntariness instruction may be appropriate.  *Id*. at 174.  The types of "general" instructions that may be appropriate include an article 38.22, section 6 voluntariness instruction and an article 38.22, section 7 warnings instruction (regarding the warnings required by sections 2 and 3).  *Id*. at 173.  It is the defendant's responsibility to delineate which type of

"involuntariness" he is claiming so that the judge can determine the appropriate instruction. *Id.* at 174.

A trial court "has an absolute sua sponte duty to prepare a jury charge that accurately sets out the law applicable to the specific offense charged." *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007); *see* Tex. Code Crim. Proc. Ann. art. 36.14 (Vernon 2007). When a statute, such as article 38.22, requires an instruction under certain circumstances, that instruction is "law applicable to the case," and the trial court must instruct the jury on what is required under the statute. *Oursbourn*, 259 S.W.3d at 180.

## C. Discussion

At trial, Montoya made the following objection, outside the presence of the jury:

> [M]y objection is under 38.22, section 3(a)(2), wherein the oral statement is required to demonstrate that the accused knowingly, intelligently, and voluntarily waived any rights set out.
>
> We hear the Miranda warning read to the—to Mr. Montoya. However, the question that he answers "yes" to is, "do you want to speak to me?" There is never any indication that [Montoya] directly understood, that he acknowledged that he understood *Miranda* and its consequences.
> When [Montoya] is asked initially, immediately after the *Miranda* warning is given, he does not answer, and the officer begins to have further discussion—discussions with him that I think can be taken almost as if it's a—some sort of promise of leniency or something of that nature."

10

## 1. Article 38.22, section 6

Article 38.22, section 6 becomes "law applicable to a case" once a question is raised and actually litigated as to the general voluntariness of an accused's statement; however, a factual dispute is not necessary. *Id.* at 175–76, 180. A question of voluntariness is raised when a party notifies the trial court or the trial court raises the issue on its own. *Id.* at 175. A claim under section 6 that an accused's statement was made involuntarily may include situations involving police overreaching, youth, intoxication, illness or medication, mental incapacitation, or other disabilities. *Id.* at 172–73. Although, these fact scenarios alone are not enough to render a statement inadmissible, they are factors a jury is entitled to consider when armed with a proper instruction. *Id.* at 173.

The court of criminal appeals has stated that the sequence of events contemplated by section 6 is as follows:

> (1) a party notifies the trial judge that there is an issue about the voluntariness of the confession (or the trial judge raises the issue on his own); (2) the trial judge holds a hearing outside the presence of the jury; (3) the trial judge decides whether the confession was voluntary; (4) if the trial judge decides that the confession was voluntary, it will be admitted, and a party may offer evidence before the jury suggesting that the confession was not in fact voluntary; (5) *if such evidence is offered before the jury, the trial judge shall give the jury a voluntariness instruction.*

*Id.* at 175 (emphasis added).

11

Here, we agree with Montoya's assertion that he raised the issue of voluntariness to the trial court when he objected, outside the presence of the jury, to the voluntariness of his statement under article 38.22.[7] We disagree, however, with his conclusion that he offered evidence before the jury, thereby mandating the requested jury charge instruction.

Under article 38.22, there is no error in refusing to include a jury instruction when there is no evidence before the jury to raise the issue. *Miniel v. State*, 831 S.W.2d 310, 316–17 (Tex. Crim. App. 1992); *Hernandez v. State*, 819 S.W.2d 806, 812 (Tex. Crim. App. 1991) (citing *Wagner v. State*, 687 S.W.2d 303, 307 (Tex. Crim. App. 1984)), *overruled on other grounds by Fuller v. State*, 829 S.W.2d 191 (Tex. Crim. App. 1992). Some evidence must have been presented to the jury that the defendant's confession was not given voluntarily. *Alvarado v. State*, 912 S.W.2d 199, 211 n.9 (Tex. Crim. App. 1995); *Hernandez*, 819 S.W.2d at 812 (citing *Brooks v. State*, 567 S.W.2d 2 (Tex. Crim. App. 1978)).

We note that Montoya does not discuss, or provide a citation to, any evidence before the jury showing that the issue of voluntariness was actually litigated. Instead, he cites only to the arguments that he raised outside the presence of the

_____

[7] At trial, Montoya objected to the voluntariness of his statement on two grounds—failure to acknowledge his understanding of *Miranda* and Detective Lundy's alleged promise of leniency. Thus, to the extent Montoya asserts that his statement was involuntary because "he was still under the influence of cocaine and/or alcohol at the time of his interrogation," he has failed to preserve this issue for review. *See* Tex. R. App. P. 33.1(a)

jury. Upon independent review of the record, we cannot find where Montoya testified before the jury, called witnesses, or cross-examined the State's witnesses on the issue of voluntariness—that is, there is no testimony pertaining to Detective Lundy's alleged promise of leniency.[8] In fact, the only testimony pertaining to the voluntariness of Montoya's statement came during the State's direct examination of Detective Lundy. *See Brooks*, 567 S.W.2d at 3 (holding that evidence presented by the State in anticipation of an attack upon the voluntariness of a confession does not put voluntariness in issue). Thus, because the parties did not litigate the voluntariness of Montoya's statement before the jury, the trial court did not err by not including a section 6 instruction sua sponte in the jury charge. *See Hernandez*, 819 S.W.2d at 812–13 (holding appellant was not entitled to a section 6 instruction because he failed to present evidence to the jury that his statements were not given voluntarily); *see also Aldaba v. State*, No. 14-08-00417-CR, 2009 WL 1057685, at *3 (Tex. App.—Houston [14th Dist.] Apr. 16, 2009, pet. ref'd) (concluding trial court was not on notice that a section 6 instruction might be required where the parties did not litigate the voluntariness of appellant's statements in some manner).

---

[8] Although section 6 does not require that there be a fact dispute, it *does* require that evidence pertaining to the issue of voluntariness be submitted to the jury. *See Oursbourn*, 259 S.W.3d at 175. How else is the jury to know that there is a voluntariness issue if, as in this case, it does not receive any evidence as to the alleged promise of leniency?

## 2. Article 38.22, section 7

Article 38.22, section 7 becomes "law applicable to a case" when the evidence raises an issue regarding (1) law enforcement's compliance with the statutory warnings set out in Texas Code of Criminal Procedure article 38.22, sections 2–3 and (2) the voluntariness of a defendant's waiver of his rights. *Oursbourn*, 259 S.W.3d at 176. An issue is "raised by the evidence" if there is a genuine factual dispute. *Id.* A genuine factual dispute occurs when the defendant offers evidence that would create a reasonable doubt as to a specific factual matter that relates to compliance with the statutory warnings of sections 2 or 3 of article 38.22 and is, therefore, essential to the voluntariness of the statement. *See id.* at 177. When there is no disputed factual issue, the legality of compliance with the statutory warnings regarding the statement is determined by the trial court alone, and a section 7 instruction is not required. *Id.* at 177–78.

Section 3 of article 38.22 provides that no oral statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless (1) the statement was recorded and (2) prior to the statement but during the recording, the accused was warned of his rights and knowingly, intelligently, and voluntarily waived those rights. Tex. Code Crim. Proc. Ann. art. 38.22, § 3 (Vernon 2005). The warning must inform a defendant of the following rights:

14

(1) [H]e has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

(2) any statement he makes may be used as evidence against him in court;

(3) he has the right to have a lawyer present to advise him prior to and during any questioning;

(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he has the right to terminate the interview at any time[.]

*Id.* art. 38.22, § 2.

Here, although Montoya's statement was clearly made as a result of a custodial interrogation, he cites no facts to support his argument that the trial court should have included a section 7 instruction. Rather, Montoya states only that the "issue was raised." After an independent review, however, we can find no evidence disputing Detective Lundy's compliance with the statutory warnings set out in article 38.22, sections 2 and 3 or the voluntariness of Montoya's waiver of those rights. Thus, the trial court did not err by failing to include a section 7 instruction sua sponte in the jury charge.

### D. Conclusion

Because Montoya was not entitled to instructions under sections 6 and 7 of article 38.22, the trial court did not err by failing to submit a jury charge on the question of voluntariness. *See White v. State*, 779 S.W.2d 809, 827 (Tex. Crim. App. 1989) (concluding appellant was not entitled to section 6 instruction); *see also*

15

*Brownlee v. State*, 944 S.W.2d 463, 467–68 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd) (concluding no error occurred in failing to submit a section 7 instruction on voluntariness). Accordingly, we overrule Montoya's first point.

## IV. Admission of Evidence

In his second point, Montoya asserts that the trial court abused its discretion by admitting the videotape of his oral confession after he timely objected on the ground that the confession had been obtained in violation of article 38.22 of the code of criminal procedure.

### A. Standard of Review

An appellate court may not disturb a trial court's evidentiary ruling absent an abuse of discretion. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). In other words, as long as the trial court's decision was within the zone of reasonable disagreement and was correct under any theory of law applicable to the case, it must be upheld. *Id.* (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g)). This is so because trial courts are usually in the best position to make the call on whether certain evidence should be admitted or excluded. *Id.*

### B. Applicable Law

As discussed above, under article 38.22, section 3, an oral statement resulting from a custodial interrogation is admissible only if an officer warns the defendant of his *Miranda* rights and the accused executes a knowing, intelligent, and voluntary

waiver of those rights.  *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 3; *see also*

*Penry v. State*, 903 S.W.2d 715, 744 n.24 (Tex. Crim. App. 1995) (stating that Texas

statutory warnings codified in article 38.22 comply with *Miranda*).

To determine whether an accused effectively executed a valid waiver of rights,

we must decide whether the waiver was a "product of a free and deliberate choice

rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412,

421, 106 S. Ct. 1135, 1141 (1986); *Ripkowski v. State*, 61 S.W.3d 378, 384 (Tex.

Crim. App. 2001).  We must also determine whether the waiver was given "with a full

awareness of both the nature of the right being abandoned and the consequences

of the decision to abandon it." *Moran*, 475 U.S. at 421, 106 S. Ct. at 1141;

*Ripkowski*, 61 S.W.3d at 384. An express waiver is not necessary, and the trial court

may find facts and evidence sufficient to support an inference of waiver.  *See Rocha*

*v. State*, 16 S.W.3d 1, 12 (Tex. Crim. App. 2000).  We consider the totality of the

circumstances when determining whether an accused effectively waived his rights

and thereby made a statement voluntarily.  *Moran*, 475 U.S. at 421, 106 S. Ct. at

1141.

**C.  Discussion**

The pertinent portions of Detective Lundy's interview, along with what the

interpreter said translated into English, are as follows:

**Lundy:** Before we talk I need to read you your *Miranda* warning.

**Interpreter:** Before you talk she needs to tell you your rights.

**Lundy:** OK. Says you have the right to remain silent and not make any statement.

**Interpreter:** Says you have the right to remain quiet and not make any statement.

**Lundy:** And any statement you make may be used against you at your trial.

**Interpreter:** And if you make a statement it can be used against you as evidence in a trial.

**Lundy:** Any statement you make may be used as evidence against you in court.

**Interpreter:** Any statement you make can be [sic] as evidence to go to court.

**Lundy:** You have the right to have a lawyer present to advise you

**Interpreter:** You have the right to hire an attorney to advise you

**Lundy:** prior to and during any questioning.

**Interpreter:** prior to and during any interview or questioning.

**Lundy:** If you're unable to employ a lawyer

**Interpreter:** If you're unable to employ a lawyer

**Lundy:** you have the right to have a lawyer appointed to advise you

**Interpreter:** you have the right to have a lawyer assigned to advise you.

**Lundy:** prior to and during any questioning

**Interpreter:** prior to and during any interview or questioning

**Lundy:** and you have the right to terminate this interview at any time.

**Interpreter:** and you also have the right to stop this interview at any moment.

**Lundy:** Are you willing to talk to me?

**Interpreter:** Are you willing to talk to the detective?

**Lundy:** I just want to hear your side of the story. I know what happened last night. I just want to hear what you have to say about that 'cause I know there's got to be an explanation for you getting so upset and so angry last night.

**Interpreter:** The detective is saying that she already knows what happened last night. She only wants to hear your side of the story. She understands that maybe something happened to you that bothered you very much.

**Lundy:** I want to hear your side of the story.

**Interpreter:** She only wants to hear your side of the story.

**Lundy:** Are you willing to tell me what happened?

**Interpreter:** Are you willing to tell the detective what happened last night?

**Lundy:** Rosa and Claudia, they're going to be fine.

**Interpreter:** Rosa [and] Claudia are going to be fine.

19

**[Montoya:]**  Yes.

**Lundy:**  But you know that Isaac . . . died last night.

**Interpreter:**  But you know that Isaac . . . um . . . died last night.

**Lundy:**  The baby, the baby is fine.

**Interpreter:**  The baby is fine.

**Lundy:**  So, can you tell me what happened?

**Interpreter:**  Do you want to tell the detective what happened?

**[Montoya:]**  Yes.

Montoya claims that, because he "never gave any verbal or nonverbal indication that he either *understood* [his] rights or *wished to waive them*," he did not intelligently, knowingly, and voluntarily waive those rights. [Emphasis in original.]  In addition, Montoya asserts that the interpreter's imprecise translations led to miscommunications regarding his rights.  Because Montoya does not challenge the validity of his waiver on the ground that it was the product of intimidation, coercion, or deception, we need only determine whether Montoya's waiver was given "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran*, 475 U.S. at 421, 106 S. Ct. at 1141; *Ripkowski*, 61 S.W.3d at 384.

### 1.  Warnings:  Fully Effective Equivalent

20

First, we note that warnings do not have to be given verbatim to be valid. *See Bible v. State*, 162 S.W.3d 234, 240 (Tex. Crim. App. 2005) (explaining that a warning is sufficient if it is the "fully effective equivalent" of the warning outlined in article 38.22, section 2). Montoya claims that the interpreter's translation of "read you your *Miranda* warning" into "she needs to tell you your rights," among other translations, led to miscommunications of his rights. This particular statement by Detective Lundy, however, is not part of the warning recited in section 2 of article 38.22 and, therefore, is not required to meet the "fully effective equivalent" standard. Moreover, in analyzing the portion of the interview that does contain the warning recited in section 2 of article 38.22, we conclude that the interpreter's word choices do not convey a different meaning from those used by Detective Lundy or the statute. *See Bennett v. State*, 742 S.W.2d 664, 677 (Tex. Crim. App. 1987), *vacated on other grounds*, 486 U.S. 1051 (1988) (concluding that the substitution of the word "trial" for "court" and the word "may" for "can" in the warning given to appellant did not dilute the meaning or import of the warning recited in section 2 of article 38.22). Thus, the interpreter's translation of Montoya's rights are the fully effective equivalent of those stated in the statute.

### 2. Waiver of Rights

We next address the validity of Montoya's waiver. The record shows that no express waiver of Montoya's rights appears on the recording. However, "the law does not require that the recording reflect an express waiver of [] rights." *Rocha*, 16

21

S.W.3d at 12 (citing *Etheridge v. State*, 903 S.W.2d 1, 16 (Tex. Crim. App. 1994), *cert. denied*, 516 U.S. 920 (1995)). A waiver of rights may be inferred from the actions and words of the person interrogated. *State v. Oliver*, 29 S.W.3d 190, 191–92 (Tex. App.—San Antonio 2000, pet. ref'd) (citing *Barefield v. State*, 784 S.W.2d 38, 40–41 (Tex. Crim. App. 1989), *overruled on other grounds by Zimmerman v. State*, 860 S.W.2d 89 (Tex. Crim. App. 1993)).

Montoya argues that in the cases in which courts have held that an express waiver is unnecessary, there was, however, at least evidence that the defendant acknowledged his understanding of his rights, which is not the case here. *See, e.g., Cubas v. State,* No. AP-74953, 2005 WL 3956312, at *3 (Tex. Crim. App. Apr. 12, 2006) (not designated for publication) (reasoning voluntary waiver existed when defendant indicated that he understood his rights and declined to ask any questions about them); *Alvarez v. State*, No. 02-07-00457-CR, 2009 WL 112783, at *3 (Tex. App.—Fort Worth Jan. 15, 2009, no pet.) (mem. op., not designated for publication) (concluding voluntary waiver existed when record demonstrated that the defendant indicated understanding of the warnings by nodding twice during the warnings and by responding "yes, sir" when informed that by answering, he would be doing so of his own free will); *Solis-Reyes v. State*, No. 13-07-00322-CR, 2008 WL 1822636, at *4 (Tex. App.—Corpus Christi Apr. 24, 2008, no pet.) (mem. op., not designated for publication) (declaring voluntary waiver when the defendant was read the warnings in Spanish and indicated he understood the warnings). Montoya seems to argue

that, because he did not expressly waive his rights *or* expressly acknowledge that he understood his rights, his waiver is invalid. We disagree.

The test for determining the validity of a waiver is not whether the defendant expressly waived his rights *or* expressly acknowledged his understanding of his rights; instead, the test is whether, based on the totality of the circumstances, waiver was given "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *See Moran*, 475 U.S. at 421, 106 S. Ct. at 1141.

Our review of the video indicates that immediately after a full and complete reading of his 38.22 rights, Detective Lundy sought a waiver of these rights by asking Montoya, "Are you willing to tell [me] what happened last night?" Although Montoya did not respond until after the second request, he did respond "yes" and appears to have willingly discussed the events with Detective Lundy.

Moreover, the trial court found, and we agree, that Montoya "communicated back and forth with Detective Lundy, through the interpreter, a great deal during the interview. There was never a moment where communication broke down or [where Montoya] appeared confused. He answered appropriately, in proper context, to all the questions he was asked; indicating knowledge and understanding." One could reasonably infer that if Montoya understood the questions being asked of him during the interview, he also understood the reading of his rights and the consequences of abandoning those rights—namely, that he had the right to remain silent and that

anything he said could be used against him at his trial. Thus, based on the totality of the circumstances, the trial court did not abuse its discretion by finding that Montoya's waiver was given with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

## D. Conclusion

Because the interpreter's translation of Montoya's rights is the fully effective equivalent of those stated in the statute and because Montoya intelligently, knowingly, and voluntarily waived his rights, we hold that the trial court did not abuse its discretion by admitting the videotape of Montoya's confession. Accordingly, we overrule Montoya's second point.

## V. Conclusion

Having overruled both of Montoya's points, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DAUPHINOT, J. concurs in part and dissents in part without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 22, 2010

24